# EXHIBIT B

MICHAEL D. KATZ, M.D.

Page 1

1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
2

3

        CATHERINE B. LAAG, a minor, :      TRANSCRIPT OF
4       by her Parent and Natural   :      PROCEEDINGS
        Guardian, JOHN LAAG and     :
5       JOHN LAAG, Individually and :
        In his own right,           :
6                                   :
                        Plaintiff,  :
7            v.                     :

8       EDWARD J. CULLEN, JR., D.O.,:
        JAMES HERTZOG, M.D., and    :
9       NEMOURS FOUNDATION d/b/a    :
        A.I. DUPONT HOSPITAL FOR    :
10      CHILDREN, a Delaware        :
        Corporation,                :
11                                  :
                        Defendants.:
12             --------------
        Tuesday, October 25th, 2005
13             --------------

14

15          Pretrial examination of MICHAEL D. KATZ,

16      M.D., held at the offices of MICHAEL D. KATZ,

17      M.D., 77 Prospect Avenue, Suite 1K, Hackensack,

18      New Jersey, on the above before DONNA E. KELLS, a

19      Certified Shorthand Reporter and Notary Public of

20      the State of New Jersey.

21

22                  --------------
                 CORBETT & ASSOCIATES
23              1400 North French Street
                    P.O. Box 25085
24            Wilmington, Delaware 19899
                    302-571-0510
25

MICHAEL D. KATZ, M.D.

Page 2

```
 1            CERTIFICATE OF OFFICER

 2

 3        I, DONNA KELLS, a Certified Shorthand

 4   Reporter and Notary Public of the State of New

 5   Jersey, do hereby certify that prior to the

 6   commencement of the examination the witness was

 7   duly sworn by me.

 8        I DO FURTHER CERTIFY that the following is a

 9   true and accurate transcript of the testimony as

10   taken stenographically by and before me at the

11   date, time and place aforementioned.

12        I DO FURTHER CERTIFY that I am neither a

13   relative nor employee, nor attorney or counsel to

14   any parties involved; that I am neither related to

15   nor employed by any such attorney of counsel, and

16   that I am not financially interested in the

17   action.

18

19

20

21

22

23   A NOTARY PUBLIC OF THE STATE OF NEW JERSEY

24   My Commission Expires May 17, 2007

25   C.S.R. License No. X101207
```

MICHAEL D. KATZ, M.D.

Page 3

```
 1

 2

 3

 4     A P P E A R A N C E S:

 5

 6                 KOLSBY GORDON
                   BY:  ROBERT HUNN, ESQUIRE
                   Suite 2250
 7                 1650 Market Street
                   Philadelphia, Pennsylvania 19103
 8                 Counsel for the Plaintiffs

 9

10                 MC CARTER ENGLISH, LLP
                   BY:  PAUL A. BRADLEY, ESQUIRE
                   919 N. Market Street
11                 Wilmington, Delaware 19899
                   Counsel for all Defendants

12

13                 RAYMOND J. KREICHELT, ESQUIRE
                   Litigation Claims Manager
14                 Nemours Corporation
                   4600 Touchton Road East
15                 Building 200 - Suite 500
                   Jacksonville, Florida 32246
16                 Counsel for Nemours Foundation,
                   d/b/a Dupont Hospital For Children

17

18

19

20

21

22

23

24

25
```

Page 4

1                          I N D E X

2

     WITNESS                          DIRECT
3    MICHAEL D. KATZ, M.D.
     By:  Mr.  Bradley                   5
4

5                        E X H I B I T S

6    NUMBER              DESCRIPTION              PAGE

7    KATZ-1        Report or Dr. Katz, dated        5
                   September 1st, Report of
8                  Dr. Katz dated September 21st,
                   and Curriculum Vitae of
9                  Dr. Katz

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          M I C H A E L   D.   K A T Z,  M.D., having

2     an office address of 77 Prospect Avenue, Suite 1K,

3     Hackensack, New Jersey 07601, having been first

4     duly sworn by the Notary, testifies as follows:

5

6               MR. BRADLEY:  I'll mark his two

7          reports and the CV as Katz Exhibit D-1.

8               (Whereupon, Katz Exhibit D-1 was

9          marked for identification.)

10

11    DIRECT EXAMINATION

12    BY MR. BRADLEY:

13

14        Q.    Doctor, does that constitute the

15    reports you prepared in this case and your most

16    recent CV, what we've marked as Katz-1?

17        A.    That's not even close to my most

18    recent CV.  I'll get you a copy of that right

19    now.

20        Q.    I would appreciate that.

21        A.    This is probably within the last year.

22    There is a couple of additions we can talk about

23    that I'm sure you will ask me about.

24               MR. BRADLEY:  Katz Exhibit 1, I'll

25          take the CV he's given me and substitute it,

1          for the record.

2                  MR. HUNN:   Okay.

3          Q.     Doctor, you've given us a separate CV

4    which I've put in as part of Exhibit 1.   You

5    mentioned that there's some additional things that

6    aren't in this particular CV.   Could you tell us

7    what they are?

8          A.     I have, I think, two or three more

9    clinical studies, so two or three research

10   studies.   And there's also a new board

11   certification that I have.

12         Q.     What's the Board certification?

13         A.     In neurodevelopmental disabilities.

14         Q.     When did you receive that?

15         A.     The date is on the certificate.   It

16   is right over there.

17         Q.     It looks like April 2005.

18         A.     Right, exactly.

19         Q.     And that's from the American Board of

20   Psychiatry and Neurology?

21         A.     Right.   That's a sub board, of that

22   one, of the neurology with special qualifications

23   in child neurology.   That's another sub board.

24         Q.     You mentioned participating in some

25   clinical trials?

1        A.      Right.

2        Q.      What do they do?

3        A.      I used to, I don't any more, but I

4    used to be a medical director of a clinical

5    research organization and so I would do mainly

6    pharmacology trials, different drug trials for

7    different things, mainly pain.

8        Q.      Have you done any studies on Life

9    Expectancy of Children in a Persistent Vegetative

10   State?

11       A.      No, I have not.

12       Q.      On your CV it says that you were the

13   Section Chief of Pediatric Neurology at Hackensack

14   University until 2003.   Is that correct?

15       A.      Right, across the street.

16       Q.      Are you still connected to the

17   Hackensack University Medical Center at all?

18       A.      Yes.   I'm just an attending

19   physician.   I don't work for them any more.

20       Q.      Why did you leave that position?

21       A.      I needed to make a living.

22       Q.      It also has on here 2004 to the

23   present Director of Neurology and Pain Management

24   Division?

25       A.      Right.

1      Q.     Can you tell me what that is?

2      A.     That's exactly what I was talking

3   about.   That's the clinical research

4   organization.   They do clinical research.   We do

5   specifically neurology and mainly pain type

6   research.   And I will run the clinical trials,

7   you know, approve or disapprove what we would do.

8   I don't do that any more because that's what I

9   initially did.

10      Q.     Let me get that correct.   You said

11   you don't do that any more.   What is it you don't

12   do any more?

13      A.     I recently resigned from that

14   position.

15      Q.     So when it says to present --

16      A.     That's what I'm saying.   This CV is

17   probably a year old.   It doesn't have that from

18   April and it doesn't have the fact that I resigned

19   from that.   I have to take care of business with

20   that.

21      Q.     Is there anything else that should be

22   on the CV to bring it up to date?

23      A.     As I said, there's two or three other

24   studies that need to be on that.

25      Q.     The ones you've already described?

1      A.    Yes.

2      Q.    And you have two reports that I

3  attached as Exhibit 1.    Do you have any other

4  reports you've given in this case?

5      A.    I don't believe there are two reports.

6  There's one report and I believe it is one letter

7  just saying -- is that correct, yeah, the life

8  care plan.

9      Q.    You sent two letters, one dated

10  September 1st and one dated the 21st.

11      A.    The September 21st is not really a

12  report.   It is just a letter because that life

13  care plan wasn't ready.   I didn't see it by July

14  1st when I dictated first.    That's kind of an

15  addendum letter to the first report.   So it is

16  really one letter, one report.

17      Q.    Okay.    Have you submitted any other

18  letters or reports related to Catherine Lagg?

19      A.    No, I have not.

20      Q.    Does the letter in the report contain

21  your opinions that you intend to give in the case?

22      A.    Yes, they do.

23      Q.    Are there other opinions you intend to

24  give that aren't reflected in those two reports?

25      A.    Only if I get other facts.   If I get

1    other facts I reserve the right to have another

2    opinion.    But given the facts that I have

3    presently, yes, that's true.

4         Q.    Do you intend to do any other work in

5    the case between now and trial?

6         A.    It depends what questions come up and

7    what needs to be done.    If there are other

8    questions that arise I may have to, but not that I

9    foresee today.

10        Q.    As you sit here today is there

11   anything you intend to do in the case?

12        A.    No.

13        Q.    How many cases have you reviewed for

14   the purposes of litigation?

15        A.    Probably -- is that cases that I've

16   been deposed on?    Is that cases that people have

17   given me to take a look at, see if I thought that

18   there was any validity to one claim or the other?

19        Q.    Any case you've reviewed, whether it

20   is going onto a deposition or not.

21        A.    Probably two to three dozen cases I've

22   reviewed.

23        Q.    Were those cases -- were you asked to

24   review those cases by the plaintiff's side or

25   defense side?

1      A.    Both.

2      Q.    Do you have a break down of how many?

3      A.    No.

4      Q.    Okay.

5      A.    Because most of the cases I chose not

6   to accept.

7      Q.    What kind of issues were you asked to

8   address in those cases?

9      A.    Well, my specialty is obviously

10  pediatric neurology, neurodevelopmental

11  disabilities.  Almost invariably most of the

12  cases involved a brain injured child or

13  neurologically impaired child.  So, in general,

14  that's usually what people ask me.  On any sort

15  of neurologic impairment some of them are just

16  questions of damages, some questions of

17  liabilities, and they really run the gamut.

18     Q.    Have you been asked to give life

19  expectancy before?

20     A.    I believe I have been asked that.

21     Q.    How many times?

22     A.    Less than five times.

23     Q.    And do you know the names of any of

24  the cases involved?

25     A.    That's a fair question.  No, not off

MICHAEL D. KATZ, M.D.

1    the top of my head.

2        Q.    Do you know the names of any of the

3    lawyers involved?

4        A.    Not that I know of, off the top of my

5    head.

6        Q.    Do you have a list that would refresh

7    your recollection?

8        A.    Not in my office.   In my office, in

9    general, this is where I practice medicine and

10   usually most of the things are my legal cases,

11   because there are huge charts usually at home.

12       Q.    So you have something at home that

13   would refresh your recollection?

14       A.    Well, there's more of a chance it is

15   at home rather than here but I can't tell you

16   specifically yes, specifically no.

17       Q.    Have you reviewed cases on behalf of

18   Mr. Hunn's office before?

19       A.    Yes, I have.

20       Q.    How many times?

21       A.    This is actually my first case that

22   I'm working with Mr. Hunn but in his office I

23   believe two or three.

24       Q.    In those cases have you ever given a

25   deposition before?

MICHAEL D. KATZ, M.D.

1        A.    Yes, I have.

2        Q.    How many times?

3        A.    I'm not sure.    I think in two other

4   -- I think in the other two cases I have given a

5   deposition but I'm not sure whether it is one or

6   both cases.

7        Q.    Do you have a list of cases where

8   you've given a deposition?

9        A.    Not in my office, no.

10       Q.    How about at home?

11       A.    It is possible that I have the

12   transcripts of the trials -- I'm sorry,

13   transcripts of the depositions.

14       Q.    If you do I would ask that you produce

15   them to Mr. Hunn for me.

16       A.    Yes.

17       Q.    How about trial testimony?    Have you

18   testified at trial before?

19       A.    Yes, I have.

20       Q.    How many times?

21       A.    Once.

22       Q.    And where was that?

23       A.    Philadelphia.

24       Q.    Is that on behalf of Mr. Hunn's firm?

25       A.    Yes, it was.

1          Q.    What was the name of that case?

2          A.    I don't know, off the top of my head.

3          Q.    Did you ever review any transcripts of

4    that testimony?

5          A.    Actually, I haven't.

6          Q.    Do you have that testimony at home?

7          A.    No, actually in the trial -- I

8    actually have never seen a copy of the trial

9    testimony.

10         Q.    How long ago did you testify at trial?

11         A.    Within the last two years.

12         Q.    Do you know who at Mr. Hunn's office

13   you were working with on that case?

14         A.    I believe it was Mr. Basar (phonetic).

15         Q.    Do you know what kind of case that

16   was?

17         A.    I'm blocking.  I'm sorry.

18         Q.    I don't know if I asked you this or

19   not.  How many total times have you been deposed?

20         A.    Probably less than a dozen.

21         Q.    As you sit here today can you tell me

22   the names of any of the lawyers involved in those

23   depositions?

24         A.    Well, certainly Mr. Basar's firm.

25   Actually, I wasn't prepared for that question.   I

MICHAEL D. KATZ, M.D.

1    don't remember off the top of my head.

2         Q.    Do you know how you first were

3    contacted by Mr. Hunn's firm with regard to any

4    type of case?

5         A.    Any type of case, I believe Mr. Hunn

6    got my name through Mr. Basar because they work in

7    the same firm.    I don't know how I originally

8    contacted Mr. Basar or he contacted me.    I really

9    don't know.    I don't remember.

10        Q.    Mr. Hunn handed me about seven

11   articles this afternoon.    Are these the seven

12   articles that you've reviewed for the purposes of

13   this case?

14        A.    Yes, I have.

15        Q.    And are these articles that you intend

16   to rely upon in your testimony?

17        A.    Yes, yes, I do.

18        Q.    Prior to use in this case have you

19   ever reviewed these articles before?

20        A.    Actually, these are from articles that

21   are from journals that I usually read so, yes.   I

22   get the New England Journal.    I have it there.

23   I get the Child Neurology Journal.

24             So these are from pretty standard

25   pediatric neurology journals.    None of them are

1    from, for example, the South Korean Journal of

2    Medicine or anything like that.

3        Q.    So you think you reviewed, at the time

4    it initially came out, the article Life Expectancy

5    and Median Survival Time in a Permanent Vegetative

6    State?

7        A.    I have to tell you, my wife makes fun

8    of me but I read the New England Journal every

9    week as well as the other journals.    I would have

10   to say that it is very, very likely that I have

11   seen all those articles and that would be

12   something that I would be interested in.

13       Q.    Do you get the Pediatric Neurology

14   Journal?

15       A.    Yes.

16       Q.    Do you read that routinely?

17       A.    I probably have been reading it for 15

18   years on a routine basis.

19       Q.    Do you believe the article that I've

20   just mentioned by David Strauss and others is an

21   authoritative article?

22       A.    I think it is a pretty good article.

23       Q.    I see you have copy of it in front of

24   you.

25       A.    Yup.

1        Q.     Are there any other articles that you

2   reviewed or that you intend to rely upon, other

3   than the ones given to me today?

4        A.     No, I think that's it.

5        Q.     In your report you identify certain

6   records that you reviewed relating to Catherine

7   Lagg.   Is that correct?

8        A.     That's correct.

9        Q.     Other than what's identified in your

10  report, are there any other records that you've

11  reviewed?

12       A.     Well, those are the records I reviewed

13  at the time of writing that report.  Subsequently,

14  I have had the opportunity to review the

15  deposition of Dr. Peter Turner, which I have here.

16  I'm sure you have a copy of it.

17            And I have seen some early

18  intervention, the early intervention records from

19  Shamonk Township, the school records.   And I have

20  had the opportunity to read Nurse Bates' report,

21  but at the time that this report was done I had

22  not seen that report.   Do you remember we talked

23  about that?  That's why I wrote that letter.

24       Q.     You mentioned some school district

25  records that you saw?

Page 18

1        A.      The early intervention reports.

2        Q.      When did you first see those records?

3        A.      I think the early intervention is

4   somewhere around the time when I reviewed Nurse

5   Bates' report.  I'm not sure if it was a little

6   after or a little before I got the reports.

7        Q.      When you first prepared your report in

8   July of 2005 you had school district records,

9   correct?

10       A.      Right.  But I think there was

11  additional school records or additional reports,

12  if my memory serves me.

13       Q.      Can I see the particular records you

14  are talking about?

15               THE WITNESS:   Do we have them?

16               MR. HUNN:  I would have sent you

17          whatever we got from Voorhes, which would

18          have included additional school records.

19       Q.      Do you have those records in the pile

20  there that you are speaking of?

21       A.      This is her report.   I think there

22  were records in addition to these.   My memory is

23  not --

24               MR. HUNN:  Well, if you are asking me

25          I know I've sent additional Voorhes records.

1       They would have included some school

2       records.

3              THE WITNESS:    Right.

4       Q.    What's sitting in front of you right

5    now are the articles you've identified.

6       A.    Sitting in front of me are the

7    articles, Nurse Bates' report, the articles, my

8    report and the letter.

9       Q.    Any records relating to Catherine

10   Lagg, where would they be?

11      A.    They've come from -- the school

12   records and everything I've received came from

13   Mr. Hunn.    I wouldn't have any opportunity to

14   independently receive any of the records.

15      Q.    But where are they physical located

16   now?

17             MR. HUNN:    Where are your records,

18       he's asking you?

19             THE WITNESS:    They are at home.

20      Q.    And you went to see Catherine Laag in

21   April 2005.    Is that correct?

22      A.    That sounds about right.

23      Q.    When you went to see her did you keep

24   any notes relating to your visit?

25      A.    No.    Usually when I go and see a

Page 20

1    patient, literally, I bring my cell phone and I

2    will dictate records.    I will dictate a note

3    right then and there.    This is my dictation.

4        Q.    Is there a separate document relating

5    to that dictation you gave when you went to see

6    her?

7        A.    No, this is actually -- except for

8    grammatical corrections, this is exactly what I

9    dictated.

10       Q.    How does it get from your cell phone

11   to your report?

12       A.    Believe it or not, modern technology.

13   I have a dictation service that probably goes

14   around the world and then it is dictated and I get

15   it the next day.    All my medical records and

16   everything get dictated.  In fact, I usually

17   dictate right in front of a patient.    When a

18   patient comes to see me I dictate it right there.

19   I usually don't take notes.

20       Q.    Okay.

21       A.    And then I have it printed out.    I

22   take a look at it, make sure the grammar looks

23   okay, the spacing looks okay, and that's the

24   report.

25       Q.    When you went to see her on that day

1    you dictated something while you were at the

2    Voorhees Facility?

3            A.      Actually right in my car.

4            Q.      Is that piece of paper, whatever came

5    from dictation, do you still have that?

6            A.      Well, this is it.  Except for cleaning

7    up the grammatical errors, this is what I

8    dictated.

9            Q.      Are you telling me you dictated your

10   whole report at the time you saw her at the

11   Voorhees Facility?

12           A.      That's what I'm telling you.

13           Q.      I just want to make sure I understand.

14           A.      That's a fair question.

15           Q.      What do you charge hourly for

16   preparing a report and doing the work you did in

17   this case?

18           A.      Usually I charge $300 an hour.    In

19   this case specifically there was travel time and

20   the like and I charge usually $500 for the report

21   on top of that.

22           Q.      So you would have charged $300 an hour

23   to go see Catherine Laag, review her records?

24           A.      See her, examine her, exactly.

25           Q.      And then $500 for the report?

1          A.    Yes.

2          Q.    How much do you charge for testifying

3    in depositions?

4          A.    $2,500.

5          Q.    And how about at trial?

6          A.    $5,000 to $6,000 and travel time.

7          Q.    How do you arrive at that deposition

8    fee?

9          A.    How does anyone arrive at any fee --

10   that's just the fee.

11         Q.    That's your fee whether it takes half

12   hour or a day?

13         A.    I have to tell you, I've never had a

14   deposition that took a half hour.   Usually it is

15   -- usually it is $2,500 for up to four hours and,

16   in my experience, I've never had one take less

17   than four hours.   And then if it is four to eight

18   hours it is $5,000.   It is $5,000 a day so it is

19   usually half a day.

20         Q.    Are there any observations of

21   Catherine Laag that you have not placed in your

22   report?

23         A.    No.

24         Q.    And your opinion that you've rendered

25   was that she was in a persistent vegetative state?

1          A.      That is correct.

2          Q.      Is there a common definition of

3     persistent vegetative state?

4          A.      You could see by looking at all the

5     papers that everyone has a variation on the theme.

6     I think it depends on, you know, which author.

7     There's a whole host of definitions.

8                  I think that it is basically an

9     individual who is unaware of their surroundings.

10    Despite being conscious, they are unaware of their

11    surroundings.    They can't localize pain.

12    Honestly, depending on the author or the paper, at

13    least from a practical point of view, they do vary

14    somewhat.    That's the basic theme.

15         Q.      But your bottom line is that they are

16    unaware of themselves and their environment?

17         A.      Exactly.

18         Q.      And they are unconscious?

19         A.      No, they are conscious.

20         Q.      What do you mean by that.

21         A.      Their eyes are awake but they don't

22    have a normal sleep/wake cycle.

23         Q.      They have some sleep/wake cycle?

24         A.      Yes.

25         Q.      And they cannot feel pain.    Is that

MICHAEL D. KATZ, M.D.

1    correct?

2         A.    Well, that's more of a -- I would say

3    can't localize pain is probably a more appropriate

4    way of saying it.   I think that certainly people

5    in persistent vegetative states, when you stick

6    them or draw blood or do painful procedures, you

7    know, they will cry or they will obviously be

8    uncomfortable and have an elevated heart rate.

9              I probably take issue with the fact

10   that they don't feel pain.   I think they can't

11   localize pain would be a more appropriate way of

12   saying it.

13        Q.    Can you cite me to some article or

14   study to support what you just said about they

15   can't localize pain versus they don't feel pain?

16        A.    That's just -- honestly, it may be in

17   one of these articles.

18              That's just my personal opinion from

19   working with people who are neurologically

20   impaired for more than a decade.   So it may be

21   one of these articles, but that's my own

22   definition.   That's my own personal observation

23   and that's what I've seen.

24        Q.    You have the article in front of you.

25   Can you show me one that says --

Page 25

1        A.      I think that we can go through it.    I

2   think the question is what my definition is, and

3   that's my definition.    It may be one of these

4   articles.    It may not be, but that's my

5   definition.

6        Q.      Whether it is one of these articles or

7   not can you point me to any article that supports

8   what you just said?

9        A.      That's my personal -- that's what I've

10  seen on more than one occasion and it may be in

11  one of the articles.    It may not be.  Regardless

12  of whether it is in the article or not, that's my

13  belief.

14       Q.      Are you aware of the Multi-Society

15  Task Forces on Persistent Vegetative State?

16       A.      I think that's The New England Journal

17  of Medicine article from 19 -- is that 1990?

18  What year is that article from?    I have the

19  article in front of me.

20       Q.      It is one of the articles you gave me.

21       A.      1994, yes, I am.

22       Q.      Is there more than one article in the

23  New England Journal by the Multi-Society Task

24  Force on Persistent Vegetative State?

25       A.      Yes, there are.    There is a part one

1    and part two.

2         Q.    Do you find those articles to be

3    authoritative?

4         A.    I think it is part of a confluence of

5    literature on the subject.

6         Q.    Part of what?

7         A.    Confluence of literature on the

8    subject.

9         Q.    Why did you, in particular, pull these

10   two articles?

11        A.    Well, I thought they were pretty good

12   articles.

13        Q.    Is there something in your report or

14   in your opinions that you are relying on in these

15   two articles?

16        A.    Well, I think that there are obviously

17   -- there's a lot of what I believe to be true in

18   these articles but not 100 percent.

19        Q.    Are you aware of any later articles by

20   the Multi-Society Task Force on Persistent

21   Vegetative State that contain the medical aspects

22   of the persistent vegetative state?

23        A.    Am I aware of them?

24        Q.    Yes.

25        A.    Not that I know of, off the top of my

1    head.

2        Q.    So as far as you know the two articles

3    that you've given me from the New England Journal

4    are the latest writings by that task force?

5        A.    Yes.

6        Q.    Would you agree that the vegetative

7    state can be diagnosed according to some of the

8    following criteria; one, no evidence of awareness

9    of self or environment and, two, inability to

10   interact with others?

11       A.    I think that's fair to say.

12       Q.    Would it also be fair to say that

13   there's no evidence of sustained reproducible

14   purposeful or voluntary behavioral response to

15   visual, auditory, tactile or noxious stimuli?

16       A.    Well, I see where you are reading

17   from.  I think that's reasonable to say.

18       Q.    No evidence of language comprehension

19   or expression?

20       A.    Yes, I think that's reasonable to say.

21       Q.    Intermittent wakefulness manifested by

22   the presence of sleep/wake cycles?

23       A.    That's fair to say.

24       Q.    Would you agree with the other items

25   in that paragraph from the article numbers V, VI

1    and VII?

2        A.    Yes.

3        Q.    Would your opinion be that Catherine

4    is in a permanent vegetative state?

5        A.    No.

6        Q.    Would you agree that at least some

7    authors state that if one is in a persistent

8    vegetative state beyond a year that that's

9    considered permanent?

10       A.    Yes, I'm aware of that.

11       Q.    And you disagree with that?

12       A.    In this case, yes.

13       Q.    And what studies do you rely on to

14   arrive at an opinion that one in a persistent

15   vegetative state beyond one year is not in a

16   persistent state?

17       A.    Because I think there's some

18   controversy about the concept of permanent

19   vegetative state and permanent and persistent

20   vegetative state in pediatrics.   I would say in

21   the pediatric literature, I would say this is done

22   except, although it is not as well agreed upon by

23   the pediatric neurology community, as opposed to

24   the adult neurology community.

25       Q.    So a lot of the writings, a lot of

1    what you quote is based on the adult neurology

2    literature?

3        A.    I would say there's some flexibility

4    or there's some at least mild disagreement in that

5    concept in the pediatric neurology literature.

6        Q.    Can you cite me any article that

7    supports your position on that issue?

8        A.    Well, I'm going to pull this article,

9    this 1999 article which essentially does away with

10   this concept of permanent persistent vegetative

11   state and just uses the concept of vegetative

12   state.

13       Q.    Where does it say that one in a

14   vegetative state beyond one year, in this case two

15   years, is not in a permanent condition?

16       A.    I'm sorry.    Could you ask that

17   question again?

18       Q.    Sure.    Where within the article that

19   you are relying on, which is the Strauss article

20   Life Expectancy Meeting Survival tying in a

21   permanent vegetative state, where does it say that

22   there's not a permanent vegetative state?

23              MR. HUNN:    Objection to form.

24       A.    It doesn't say that.

25       Q.    In fact, part of the title is

1    permanent vegetative state, is it not?

2         A.    Yes, it is.

3         Q.    Can you point to anything in that

4    article that supports the opinion you stated, that

5    someone in a persistent vegetative state over one

6    year is not in a permit condition?

7         A.    No, I can't.

8         Q.    Can you cite me any article, as you

9    sit here today, to support that opinion?

10        A.    No.

11        Q.    In your report on page, I believe it

12   is page two, Doctor.

13        A.    Okay.

14        Q.    In the next to last paragraph on page

15   two.

16        A.    Uh-huh, yes.

17        Q.    You discuss an MRI of the brain that

18   you reviewed.

19        A.    Right.

20        Q.    Was that a report that you reviewed or

21   the actual film?

22        A.    I think I reviewed the report but I

23   may have reviewed the film.  I don't remember.

24        Q.    And could you tell me -- by the way,

25   before I get to that, do you have time records

1    relating to the time you spent in this case?

2        A.    No, I don't believe I do.

3        Q.    Have you submitted a bill to Mr. Hunn?

4        A.    Yes, I have.

5        Q.    How much was the bill?

6        A.    He would have to help me.    I believe

7    it is somewhere between eight to 12 hours plus the

8    deposition, approximately.

9        Q.    Is there somewhere at home or here in

10   the office where you have a bill or something you

11   can show us the time you spent?

12       A.    No, because usually after I do it I

13   write out the bill and send it out.    Mr. Hunn may

14   have the bill but I don't know any place after I

15   sent out the bill that I would have a copy, but I

16   can look for you.

17       Q.    Back to your report on the MRI.

18       A.    Sure.

19       Q.    You are you describing the report that

20   you read.

21       A.    I believe I am.    I may have seen the

22   film, but I believe it was probably the report.

23       Q.    And from your description what does

24   that mean to you?    What does that tell you?

25       A.    Just that she had global brain injury.

MICHAEL D. KATZ, M.D.

Page 32

1        Q.     And then you mention an EEG.   Again,

2    did you just simply read the report, I assume?

3        A.     Yes.  I read the report.

4        Q.     On the last page of your report you

5    give an opinion that "The life expectancy for a

6    person with down syndrome has been reported to be

7    58.6 years.

8        A.     Yes, that's correct.

9        Q.     What article are you relying on for

10   that opinion?

11       A.     The Australian article, Changing

12   Survival Profile with Down Syndrome, Implications

13   for Genetic Counseling.  The life expectancy was

14   58.6 years.  It is right here.

15       Q.     Are you aware of any other reports or

16   studies that support that position?

17       A.     Well, this report from the State of

18   California, also from Strauss and Shavelle, quotes

19   that article as well.  That's fairly

20   authoritative about the life expectancy.

21       Q.     Are there any others?

22       A.     No, those are the two articles I'm

23   quoting specifically for that state.

24       Q.     Did you find the treatment that

25   Catherine Laag was receiving at the Voorhes

1    facility to be reasonable and necessary?

2         A.    I thought it was.  Yes, I agree with

3    that.

4         Q.    Are you a member of the American

5    Academy of Neurology?

6         A.    Yes, I am.

7         Q.    Pardon?

8         A.    Yes, I am.

9         Q.    The next opinion you give, I'm

10   skipping around a little here, life expectancy is

11   more or less a statistical average.   Is that fair

12   to say?

13        A.    Yes.

14        Q.    And as you state in your report it is

15   an average number of years lived by a large group

16   of similar people, correct?

17        A.    Exactly.

18        Q.    Fair to say?

19        A.    Fair to say.

20        Q.    Did Drs. Ashwal, Strauss and Shavelle

21   in their reports on Life Expectancy in Median

22   Survival Time in a Permit Vegetative State, is

23   that what they tried to study in their report?

24        A.    Yes.

25        Q.    And in their report, and you can turn

1    to page 629, table three?

2        A.    There's only table one and two on

3    that.

4        Q.    Does that give the Median Survival

5    Times and Life Expectancy under certain

6    conditions?

7        A.    Yes.

8        Q.    Under those conditions, which would

9    most match Catherine Laag?

10        A.    The top most curve.

11        Q.    That would be age 15?

12        A.    Yes, total survival four years, TSO

13    equals four years.

14        Q.    What does TSO stand for?

15        A.    Time since onset.

16        Q.    Okay.    And her time since onset for

17    her is actually two years.    Is that fair to say?

18        A.    That's fair to say.

19        Q.    So you used the four-year period?

20            MR. HUNN:    I object to the form.

21        Q.    You think that's the closest one that

22    matches it?

23        A.    Yes, unless you tell me something

24    different.

25        Q.    I'm just asking you.    They have age

MICHAEL D. KATZ, M.D.

1   15 one year after onset and four years after

2   onset.

3        A.    Well, she's two years so she's

4   somewhere between one and four.

5        Q.    Somewhere between?

6        A.    Yes.

7        Q.    In their report they are stating that

8   the median survival time, if you just do a range,

9   is between 5.2 and seven years.

10       A.    That's correct.

11       Q.    And the median means half will survive

12  and half will die.   Is that fair to say?

13       A.    That's fair to say.

14       Q.    And under life expectancy they find

15  that the life expectancy is between 10 and-a-half

16  and 12.2 years.   Is that fair to say?

17       A.    That's correct.

18       Q.    And did they also state that if

19  someone was ventilator dependent that the life

20  expectancy could be lower?

21       A.    That's correct.

22       Q.    Did they also say that if one had a

23  feeding tube that the life expectancy could be

24  lower?

25       A.    That's correct.

1          Q.     Do you agree with them in their

2     findings?

3                 MR. HUNN:   I object to the form.

4          A.     In general, I agree.

5          Q.     In one of the other articles that you

6     gave us was a special article in the New England

7     Journal of Medicine, Life Expectancy of Profoundly

8     Handicapped People With Mental Retardation.    Is

9     that correct?

10         A.     Let me see.   If I gave it to you, I

11    gave it to you.   Let me see.   Yes, sure.

12         Q.     And are you using that one to show the

13    life expectancy of a down syndrome child?

14         A.     I don't think so.

15                MR. HUNN:   Objection to form.

16         A.     That's one of the articles I used to

17    come up with my opinion.   That would be correct.

18         Q.     But that relates to your life

19    expectancy you gave in terms of the down syndrome

20    issue?

21         A.     Well, yes.   That's one of the

22    articles I used to come up with that conclusion.

23         Q.     Do you know Dr. Ashwal?

24         A.     I've met him.

25         Q.     Is he a well-respected authority in

MICHAEL D. KATZ, M.D.

1    neurology?

2         A.    He's one of several well-respected

3    authorities in neurology.    That's true.

4         Q.    Do you consider him a well-respected

5    authority in neurology on Life Expectancy in

6    People With a Permanent Vegetative State?

7         A.    That's one of his specialties, yes.

8         Q.    Do you know David Strauss or Robert

9    Shavelle?

10        A.    I believe I've met Robert Shavelle.

11   I don't think I know David Strauss.

12        Q.    Now, in your report you give an

13   opinion that Catherine can be expected to live

14   into her late 20's or early to mid 30's.

15        A.    Yes, that's correct.

16        Q.    How did you arrive at that opinion?

17        A.    A couple of factors; number one is I

18   took into account the latest article I could find,

19   which is the 1999 article by Strauss, Shavelle and

20   Ashwal.

21             The second thing I took into account

22   was the fact that looking at some of these

23   articles that, sequentially, the life expectancy

24   with time is improving or increasing.

25             The next thing I took into account was

MICHAEL D. KATZ, M.D.

Page 38

1    my examination of Catherine and my experience

2    going to Voorhes.    The next piece of information

3    I took into account was Catherine's lack of

4    medical complications.    Her skin condition was

5    really first rate, no skin breakdown.    If

6    anything, her ventilator dependence is improving.

7    Her general good health was excellent.    She

8    doesn't have any cardiac problems.    The nursing

9    care she received was really superior.

10            So I took the 12.2 which is Strauss'

11    number, his most optimistic number, and that's how

12    I came up with that opinion.

13        Q.    Did you talk to any of the authors of

14    the article?

15        A.    No, I did not.

16        Q.    So you took 12.2 and you added?

17        A.    Yes, I took 12.2 and I picked up the

18    paper and I read this paragraph in the discussion

19    which says "The mortality rates observed in the

20    present study, though lower than those reported

21    elsewhere, are conservative.    If anything, they

22    overestimate the true mortality rate and thus

23    lead to underestimates of life expectancy."

24            I then, when I examined her, I really

25    found her to be in really -- to be really getting

1    quite good care and then my own personal

2    experience with people in persistent vegetative

3    state.

4         Q.    You added how many years?

5         A.    Well, she was 11, is that correct,

6    when the injury occurred?   Was she 10 or 11?

7         Q.    One or the other.

8              MR. HUNN:   She was 10.

9         A.    So 10 plus 12.2, that puts her in

10   lower 20's.   I felt given the latest piece of

11   information that I have which is Strauss,

12   Shavelle, Ashwal's article, plus what I physically

13   saw, I thought that that was an underestimate.

14             So that's why my approximation was

15   late 20's, early 30's.   That's how I came to that

16   conclusion.

17        Q.    So that if we go to the early 30's, is

18   that what you are saying?

19        A.    Late 20's, early 30's.

20        Q.    What are you saying, 28 to 32?

21        A.    Yes, that's what I'm saying.

22        Q.    So if you go to 32 you almost doubled

23   her life expectancy.

24             MR. HUNN:   Objection to form.

25        A.    Run that question by me

1    that again.

2        Q.    Sure.    According to the Ashwal

3    article, the life expectancy four years after

4    onset is 12.2 years, correct?

5        A.    Okay.

6        Q.    If you go to 32 you've added 10 years,

7    which is almost double her life expectancy.    Is

8    that fair to say?

9        A.    You have to ask me a question.    It is

10    too many numbers for me.    I'm sorry.

11        Q.    You told me you took the Ashwal number

12    from table three of life expectancy four years

13    after onset of incident.

14        A.    12.2.

15        Q.    12.2?

16        A.    Right.

17        Q.    And am I correct that you are saying

18    that her life expectancy is really from late 20's

19    to early 30's?

20        A.    Right.

21        Q.    So I said something around 32 years of

22    age, is that about what you are saying.

23        A.    That's my best guess.

24        Q.    Now, is there anything -- do you know

25    what a secular trend is as referred to by Ashwal

1    in his article?

2        A.    A secular trend, no, you would have to

3    explain that to me.

4        Q.    Okay.    That's fine.

5            Do you know if they found that outside

6    factors such as the type of care the person was

7    getting did not affect the overall life expectancy

8    in someone whose time and onset was about 10 years

9    old as a group?

10       A.    I don't know that to be true but if

11   that's what it says in the article, that's what it

12   says in the article.    I don't know that to be

13   true.

14       Q.    On page 629 it says "There was no

15   indication of a secular trend for patients 10

16   years of age or older."

17       A.    But I don't know what secular trend

18   means in day-to-day care patients.

19       Q.    I assume that you would accept their

20   finding with regard to that.

21           MR. HUNN:    Objection to form.

22       A.    I'm conceding that the article is

23   certainly something that I relied on to come to

24   the conclusion I came to.

25       Q.    Did you read in the article about

1    secular trends?

2        A.    I read it.    I read it, but it is just

3    not a term that -- it is not a term that I use.

4        Q.    Let me look and see if I can find it

5    for you.

6        A.    I saw it right here.    It is just not

7    a term that I use.    It is right here.    There was

8    indication for a secular trend for patients 10

9    years of age or older, page 629, second paragraph.

10        Q.    Do you have any understanding what

11    they mean by secular trend?

12        A.    No.

13        Q.    You don't know that they meant things

14    such as receiving better health care than others?

15        A.    Well, in the next paragraph they

16    talked about trends that they did study but they

17    didn't talk about trends that they did not study.

18    So I'm not sure -- so they looked at a very

19    limited amount of trends.

20            So, once again, it is not a term that

21    I use, you know, in every day practice.    What I

22    see are very, very limited, very, very limited

23    variables that they looked at.

24            Can we take a break?

25        Q.    Yes.

Page 43

1              (Whereupon, there was a brief recess

2        taken.)

3              MR. BRADLEY:  Back on the record.

4              Doctor, how many patients in a

5    persistent vegetative state do you currently

6    treat?

7         A.    Probably about, approximately a half

8    dozen.

9         Q.    Where are they currently located, in

10   what type of facility?

11        A.    I believe two.  Just off the top of my

12   head I think two are in an institution and I think

13   the other four are at home.  That's my best

14   guess.

15        Q.    How often do you see them?

16        A.    It depends what their medical problems

17   are.  Usually it is two to four times a year,

18   depending on what's going on or what type of

19   medical problems they have.

20        Q.    How many patients with persistent

21   vegetative state -- are in a persistent vegetative

22   state that you have treated in the course of your

23   practice?

24        A.    I couldn't -- you know, I've seen

25   thousands of patients.  I can't give you a

MICHAEL D. KATZ, M.D.

1    number.

2        Q.    You are not saying that thousands were

3    in a persistent --

4        A.    No.    Literally, I've run clinics with

5    2,000, 3,000 patients in them and people bring

6    children from institutions, from other states, for

7    my opinions.    I really can't -- I've been doing

8    this for awhile.    I really can't give you a

9    number.

10           Your question is fair, but the initial

11    question was how many patients do I currently

12    treat?

13        Q.    Right.

14        A.    With PVS, and my answer was a half

15    dozen.    The second question is how many patients

16    have I seen.    I just, you know, I just don't

17    know.

18        Q.    Let me make sure I was clear.

19           How many patients with PVS have you

20    seen?

21        A.    I don't know the answer to that.

22        Q.    Have you had patients with PVS die?

23        A.    Yes.

24        Q.    Have you had them die within five

25    years?

1      A.    Yes.

2      Q.    Have you had them die within 10 years?

3      A.    Actually not.

4      Q.    Have any survived to 10 years?

5      A.    Actually, I have a young lady I'm

6   treating now.   She's been in PVS probably for 25

7   to 30 years.

8      Q.    So I understand what you are saying is

9   you've had patients in PVS who have died within

10   five years?

11      A.    Actually, usually within the first

12   year.   That's the real high risk group of people

13   but once they've gone beyond a year, you know,

14   they tend to, and they've gotten really high

15   quality care, they tend to live for prolonged

16   periods of time.

17      Q.    And patients after one year, have you

18   had any die within that second year to the fifth

19   year?

20      A.    Perhaps I have.   I'm trying to think

21   specifically of a patient or two and I really

22   can't think of very many.

23      Q.    Have you had any die within the two to

24   10 year range?

25      A.    No, I would -- my answer is the same.

Page 46

1    Most of the patients that I've seen die with PVS,

2    die within the first year.   After the first year

3    I'm trying to think of -- I'm trying to think of a

4    patient that has died.   I'm hard pressed to think

5    of someone.

6         Q.   Have you had any die in the time frame

7    from the second year to the 15th year?

8         A.   Well, you know, granted there's a bias

9    because usually if I'm still seeing them they are

10   alive.   So I would say most of the patients that

11   I have seen that have made it beyond a year I'm

12   still seeing, and some of them have been PVS for

13   anywhere between two and this one person, you

14   know, over 20.

15        Q.   Are you telling me that none of your

16   patients who are in PVS from the second year after

17   onset to the 15th year?

18             MR. HUNN:  Objection to form.   The

19        question is can you recall.   The answer is

20        no, I cannot recall one of them dyeing in

21        that period of time.

22        A.   However, they may have died and I may

23   not have known about it.   I'm saying the patients

24   that I know about.  I do not recall a patient

25   dieing between that two and 10 years ago or two an

MICHAEL D. KATZ, M.D.

1    15 years -- they may have transferred their care

2    someplace else, but not that I know of, that I can

3    recall.

4        Q.    How many patients in PVS have you

5    followed from the second year to the 15th year?

6        A.    Well, my -- one of my real specialties

7    is taking care of kids with CP and severe cerebral

8    palsy and spasticity or tightness in muscles.

9            So it is not uncommon that people,

10   especially with brain injury, who have what we

11   call upper neuron motor signs and tightness and

12   spasticities come to see me.   Those people I see

13   or I have been seeing for several years.

14       Q.    Maybe I wasn't clear.

15           How many patients have you treated in

16   the second year to the 15th year that are in PVS?

17       A.    I can't give you a specific number.

18       Q.    Have you done any studies of your

19   patient population, of the patients in PVS?

20       A.    No, I have not.

21       Q.    And you can't tell us how many

22   patients in PVS you've treated from the second

23   year to the 15th year?

24       A.    A minimum of a half dozen, probably

25   more.

1      Q.    Out of those patients not one died

2  within that time frame?

3      A.    Not that I can recall.

4      Q.    And they may have died but you are not

5  aware of it because they weren't under your care

6  any more?

7      A.    That's correct.

8      Q.    How long have you been in practice?

9      A.    Of what?

10      Q.    In neurology.

11      A.    I've been in practice since 1991.

12      Q.    You will agree with me that in the

13  Ashwal study that you are relying on that it

14  states that people that are ventilator dependent

15  have a decreased life expectancy because of that?

16           MR. HUNN:   Objection.   Asked and

17      answered.

18      A.    Yes.

19      Q.    And the same is true with someone that

20  has a feeding tube?

21      A.    Yes.

22      Q.    Based on their study?

23      A.    Yes.

24      Q.    Now, of the patients that they studied

25  that are within their life expectancy four years

Page 49

1    after onset, 12.2 years, do you know what the

2    medical condition of any of those patients was?

3         A.    If it doesn't say that in the study I

4    have no idea.

5         Q.    So conceivably they could be in the

6    same condition, medical condition as Catherine

7    Laag, you just don't know?

8         A.    I just don't know.   That's correct.

9         Q.    And they may or may not have had the

10   same risk factors as Catherine Laag?

11        A.    That's correct.

12        Q.    They may or may not have had the same

13   findings on examination as Catherine Laag?

14        A.    That's correct.

15        Q.    You cited a provision in the study.

16   It is on page 630.   It talks about the under-

17   estimation of life expectancy.

18        A.    That's correct.

19        Q.    Have you talked with anyone about what

20   that means?

21        A.    No.

22        Q.    Have you read any articles that

23   explain what that means?

24        A.    Besides the articles in front of you,

25   no.

1      Q.    Do any of those articles explain what

2    the authors meant by underestimates of life

3    expectancy or by how much?

4      A.    I think in the discussion they speak

5    about it.

6      Q.    Do they explain by how much there is

7    an under estimation of life expectancy?

8      A.    Well, they talk about different age

9    groups.  So if that's what you mean.  It does talk

10   about that specifically, infants, or the below two

11   years old group versus the older children.  And

12   some of the other papers they talk specifically

13   about adult mortality.  I don't know if that

14   answers your question.

15     Q.    Is there anywhere within the article

16   that explains by how much there's an under-

17   estimation of life expectancy?

18     A.    In any one individual patient or in a

19   study as a whole?

20     Q.    Well, overall.

21     A.    Well, I think it speaks somewhat about

22   it but not specifically, no.

23     Q.    Is there anything that suggests that

24   the underestimation of life expectancy is 10

25   years?

Page 51

1       A.    I don't recall that being specifically

2   mentioned in the article.

3       Q.    If the underestimation of life

4   expectancy was 10 years would you conclude that

5   the article was essentially worthless?

6             MR. HUNN:   Objection to form.

7       A.    The issue about estimation and

8   underestimation of life expectancy specifically

9   quoted in my letter speaks to Catherine's life

10  expectancy, not to the life expectancy described

11  in this paper.

12      Q.    Well you, as a matter of fact, cited

13  this section in the paper about the under-

14  estimation of life expectancy and I'm asking you

15  about it.

16      A.    Well, as part of the confluence of

17  information that I needed to come to my

18  conclusion, that was one of the pieces of

19  information that I used.

20      Q.    What I'm asking you is if you read

21  this article by Dr. Ashwal and others and you

22  concluded that they underestimated life expectancy

23  by 10 years, wouldn't you conclude that the paper

24  and the study, itself, were not valid?

25      A.    The observations by the authors in

1    this paper are their observations, period.

2        Q.    Do you find them to be authoritative

3    in this particular area anyway?

4            MR. HUNN:    Objection.    Asked and

5        answered.

6        A.    We discussed that before.

7        Q.    I know.    And you said something like

8    fairly authoritative.    I'm not exactly sure what

9    fairly means.    Is it authoritative or isn't it?

10       A.    Like any study, this is a study from

11   1999.    This is a study on a finite group of

12   variables.    And specifically I use this study, I

13   use this piece of information to come to my

14   conclusion.

15           As far as these individuals being

16   experts on life expectancy, I like the article.

17   I think it was a reasonable article, but I really

18   can't speak to their overall competency or

19   expertise on this area.    I believe they've

20   written about it and they've discussed it on more

21   than one occasion.

22       Q.    In fact, do you know of anyone else

23   that's written more articles relating to life

24   expectancy of people with disabilities than

25   Dr. Ashwal and the other authors?

MICHAEL D. KATZ, M.D.

Page 53

1        A.      No, not that I know of.

2        Q.      Do you believe the New England Journal

3    of Medicine is authoritative?

4        A.      I think it is a good source of medical

5    information and I read it.

6        Q.      Did you believe or do you believe that

7    the medical aspects of persistent vegetative state

8    has presented in the New England Journal of

9    Medicine by the Multi-Society Task Force on PVS is

10   authoritative?

11       A.      I believe it is a valid article.

12       Q.      And by valid article you mean what?

13       A.      In other words, I think it has been

14   reviewed and at the time it was published it was

15   considered quite a good article.   But I also

16   think the information is changing and I think in

17   general when we speak about Catherine Laag

18   specifically there are other factors to consider.

19       Q.      You produced these two articles to me

20   today from the New England Journal of medicine

21   that you believed were sufficiently authoritative

22   to rely on.  Is that fair to say?

23       A.      That is fair to say.

24       Q.      We've mentioned that someone that is

25   ventilator dependent has a higher risk of death.

1    Is that correct?

2         A.    That is correct.

3              MR. HUNN:  Objection.

4         Q.    What is the basis for that?  What

5    specifically -- why is that the case?

6         A.    Well, I think any sort of impairment,

7    any sort of neurologic impairment, be it a tube in

8    your abdomen or a tube down your throat increases

9    your risk of infection and subsequent life

10   expectancy.

11        Q.    Can that occur rapidly, an infection

12   and death occur rapidly for someone who is

13   ventilator dependent?

14        A.    Yes.

15        Q.    And is the same true for someone who

16   has a feeding tube?  I want to make sure that we

17   are on the same wavelength on a certain issue.

18              As the primary doctor how many people

19   have you treated that were in a persistent

20   vegetative state?

21        A.    And my answer is, is that you will see

22   my CV.  I ran clinics, for example for New York

23   Medical College when I was in Valhala and I would

24   show each one of those clinics, you know, 2,000 to

25   3,000 children a year.  People would come from

1    facilities all over the State of New Jersey, from

2    Albany down to Delaware.

3              What I'm telling you is I've seen

4    thousands of children.  I just can't give you a

5    specific number of how many of those children were

6    in PVS, technically, although not one of those

7    patients that I saw was normal.  All of them had

8    neurologically -- they were neurologically

9    impaired or had other types of different

10   neurologic problems.  I can't give you an exact

11   number.  It is not something that, in my

12   specialty, is an alien concept.

13       Q.    When you say your specialty, what do

14   you mean?

15       A.    Well, specifically pediatric neurology

16   and neurodevelopmental disabilities.

17       Q.    And my question was slightly

18   different.  As the primary pediatric neurologist,

19   can you tell us how many children?

20       A.    In this case?  In general?  I'm

21   sorry.

22       Q.    Can you tell us how many children in

23   PVS that you've treated?

24       A.    Once again, my answer is, is that in

25   general I take care of children with epilepsy.  I

1    take care of children with spasticity, I take care

2    of children with a whole host of neurologic

3    problems.    Even though I'm Board certified in

4    general pediatrics, I'm not a primary care

5    physician.

6            So if the question is am I the primary

7    care physician for children in PVS, the answer is

8    almost certainly, if not never, do I participate

9    in children's care who have PVS.

10        Q.    Do you treat any adults?

11        A.    Some adults, yes.

12        Q.    How many adults do you treat?

13        A.    Well, my research experience is only

14    with adults so that I would see adults half a day

15    a week with adults, until very recently.

16            The other issue is, is I take care of

17    children that are in college and they start

18    creeping up into adulthood.    In other words, if I

19    take care of someone who has epilepsy at age 20 or

20    age 15 a lot of them have grown up because I've

21    been doing this for awhile and I don't

22    artificially cut them off.

23            In general do I prefer not to do that,

24    the answer is yes.    I prefer just to take care of

25    children.    I do take care of young adults.

MICHAEL D. KATZ, M.D.

1      Q.     You mentioned that you had, I think,

2   five or six patients that are --

3      A.     Off the top of my head, that I can

4   think of, who have PVS.

5      Q.     Can you tell me of those five or six

6   how long they are from the date of onset?

7      A.     Somewhere between two and -- except

8   in this one case where this girl is probably 25 to

9   30 years from onset, probably two to 10 years,

10  approximately.

11     Q.     Are any of them ventilator dependent?

12     A.     No.

13     Q.     Do any of them have a feeding tube?

14     A.     I think they all have a feeding tube.

15     Q.     I'm curious.   Why would you be

16  treating a person in PVS that's at least 25 to 30

17  years old?

18     A.     Well, actually, this woman she had an

19  injury when she was a teenager and she lives at

20  home actually very, very close to where my home is

21  and I go to see her at her house.

22     Q.     You see her as a friend or as a

23  treating doctor?

24     A.     As a treating doctor.   She actually

25  still sees her pediatrician.   I think she's in

MICHAEL D. KATZ, M.D.

Page 58

1    her 40's.

2         Q.    In the last five years do you know how

3    many patients in PVS you've treated?

4         A.    No.

5         Q.    In the last five years have you had

6    any patient in PVS die, that you were treating?

7         A.    No that I was treating, not that I

8    know of.

9         Q.    You issued a second report or letter

10   relating to Betsy Bate's life care plan.

11        A.    That's correct.

12        Q.    Can you tell me what you did, in the

13   course of reviewing it and issuing that letter,

14   what was your function?

15        A.    My function is to read it and to agree

16   or disagree whether I thought it was reasonable or

17   not reasonable.

18        Q.    How much time did you take to review

19   that and write that report?

20        A.    You mean write that -- probably

21   somewhere between half hour to an hour.   That's a

22   guesstimate.

23        Q.    Did you review a report by William

24   Bush?

25        A.    That's not a familiar name.

1          Q.    In reviewing the Bates report did you

2    find anything that you thought was not reasonable

3    or not necessary?

4          A.    Not that I remember.

5          Q.    When you talk about reasonable and

6    necessary you are talking about the medical

7    treatment that's being proposed as opposed to the

8    pricing and things like that?

9          A.    Yes, that's correct.

10              MR. KREICHELT:  If you are going to

11         provide a copy of whatever billings your

12         firm has received I would like a copy of

13         them, please.

14              MR. HUNN:  If you would like it, I'll

15         get them.

16              MR. KREICHELT:  And you would agree

17         that whatever billings are produced are

18         accurate?

19              THE WITNESS: Yes.

20         Q.    I think there's something else I asked

21    you to look for at your home.  Since it is not

22    here, can you produce that to Mr. Hunn?

23              MR. HUNN:  I think it was depositions

24         in my office.

25              THE WITNESS:  Specific about life

1          expectancy.    Does that sound right?

2               MR. KREICHELT:    I think you were

3          asking for all deposition transcripts he

4          had.

5          Q.    I don't recall specifically.  You said

6     you may have it at home and you would look?

7               MR. KREICHELT:    All deposition

8          transcripts?   He only said he had 14,

9          perhaps, or 12.

10              THE WITNESS:    I said less than a

11         dozen.

12              MR. KREICHELT:    That's right, less

13         than a dozen.

14         Q.    Would you agree with the statement in

15    the medical aspects of PVS in the New England

16    Journal of Medicine?

17         A.    Part one or part two?

18         Q.    Part two.

19         A.    Do you mind if I get that?

20         Q.    Page 1577.

21         A.    Okay.

22         Q.    First column; "Children in a

23    vegetative state may react to noxious stimuli, but

24    for the same reason as an adult they cannot

25    experience pain or suffer."

MICHAEL D. KATZ, M.D.

Page 61

1          A.      I'm sorry.

2                  MR. HUNN:  Where are you reading from?

3          I'm sorry.

4          A.      I don't see that.

5                  MR. HUNN:  Page 1577.

6          A.      Do I agree with that?  I don't agree

7      with it necessarily.

8          Q.      I think I may have asked this.  If I

9      did, I apologize.

10                 Do you have any study or article that

11     states otherwise?

12         A.      No, just personal and ethical beliefs.

13         Q.      What do you mean ethical beliefs?

14         A.      Well, I believe that the study of pain

15     specifically, you know, some of the clinical

16     research I've done speaks to the concept of we

17     don't know.  In other words, I think that there's

18     a concept, for example, in surgery.  When patients

19     are under general anesthesia everyone assumes that

20     they can hear what the doctors are talking about.

21     I think especially over the last decade in an

22     operating room people have become very careful

23     about what they say because there is an issue

24     whether leaving someone that underwent anesthesia

25     can understand what we talk about.

MICHAEL D. KATZ, M.D.

Page 62

1          I think the same concept occurs for

2     individuals in persistent vegetative state.   By

3     ethical, I mean that I have to assume, even though

4     there is some evidence to the contrary, that these

5     children and these adults have modesty and they

6     feel pain.

7          So I think if the concept is unclear I

8     have to assume that they feel pain.  So when I

9     treat them I treat them the same way as I would

10    treat an individual who was not in a persistent

11    vegetative state.

12         In other words, I take all reasonable

13    precautions to minimize the pain and discomfort

14    when I do any sort of treatment to them.  For

15    example, I put Emla cream, which is cream that

16    numbs their hand or numbs their skin when I take

17    blood or do something like that.  I think that's

18    just an issue of respect for these individuals in

19    PVS.

20         Q.    Did you say that since you don't know

21    if they can feel pain or not that you perform acts

22    like that?

23         A.    What I'm saying is, it is not clear.

24    Medically doctors should, and in general that's

25    pretty much a standard of care.  We have to assume

Page 63

1    that a person can hear you and they can feel and

2    that they understand pain.   We take every

3    reasonable precaution to try to avoid or diminish

4    suffering.

5        Q.    So you treat them the same as you

6    would any other patient?

7        A.    Exactly.

8            MR. BRADLEY:  That's all I have.

9            MR. HUNN:  That's it.

10

11           (Whereupon, the Deposition of MICHAEL

12       D. KATZ, M.D. was concluded at 3:41 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICER

2

3

4          I, DONNA KELLS, a Certified Shorthand

5    Reporter and Notary Public of the State of New

6    Jersey, do hereby certify that prior to the

7    commencement of the examination the witness was

8    duly sworn by me.

9

10         I DO FURTHER CERTIFY that the following is a

11   true and accurate transcript of the testimony as

12   taken stenographically by and before me at the

13   date, time and place aforementioned.

14

15         I DO FURTHER CERTIFY that I am neither a

16   relative nor employee, nor attorney or counsel to

17   any parties involved; that I am neither related to

18   nor employed by any such attorney or counsel, and

19   that I am not financially interested in the

20   action.

21

22   _____

23   A NOTARY PUBLIC OF THE STATE OF NEW JERSEY

24   My Commission expires May 17th, 2007

25   C.S.R. License #X101207