# COLUMBIA UNIVERSITY
## COLLEGE OF PHYSICIANS & SURGEONS
### DEPARTMENT OF PEDIATRICS

October 4, 2005

Robert N. Hunn
Kolsby, Gordon, Robin, Shore, and Bezar
One Liberty Place
1650 Market Street, 2nd Floor
Philadelphia, PA 19103

**Re: Catherine Lagg, a minor, vs. A.I. DuPont Hospital for Children and others**

Dr. Mr. Hunn

I am a physician specializing in the subspecialty of Pediatric Critical Care Medicine, licensed to practice in the State of New York. I am certified in both Pediatrics and Pediatric Critical Care Medicine by the American Board of Pediatrics and have practiced for 13 years in my subspecialty. I am an Assistant Professor of Clinical Pediatrics at Columbia University, College of Physicians and Surgeons and the Director of the Pediatric Critical Care Medicine Fellowship, a highly-competitive training program in the subspecialty. Previous to my tenure at Columbia, I held an academic faculty position at Yale University, School of Medicine. I have numerous medical publications and have been invited to speak on various topics in the field.

This letter concerns my findings in the above named case. My review of material includes: the office records of Catherine Laag's pediatricians from 1993 to 2003; the hospital records of the same patient for the period of 8/27/03 to 9/13/03, with specific review of the physicians' notes, nursing notes and bedside documentation sheets, the respiratory therapy notes, and the resuscitation event sheet; the depositions of Cheryl Martinenza, RN and Edward Cullen, D.O.; and the letter of Bradley Fuhrman, MD.

Catherine Laag was, at the time of her admission to A.I. DuPont Hospital, a 10 year old girl with Down Syndrome. Per her pediatricians' notes, she was a highly functioning child and was in general good health with only occasional childhood upper respiratory illness. She contracted pneumonia and was admitted to DuPont Hospital on August 27, 2003. Catherine was initially treated with antibiotics and

supplemental oxygen; however, her condition worsened. She was tried on Bilevel Positive Airway Pressure (BiPAP) support, a non-invasive mode of respiratory support, which she did not tolerate. She was intubated and placed on a conventional mechanical ventilator (CMV). Her condition rapidly deteriorated and she required ventilation with the High Frequency Oscillator (HFOV) to maintain adequate oxygenation of her blood and tissues. For several days, it was also necessary to administer Catherine a neuromuscular blocking agent to "paralyze" her muscles to allow for optimal support on the HFOV and to minimize her tissue demands for oxygen. She had a prolonged course of ventilation with gradual improvement so that it was possible to return Catherine to CMV 2 ½ days before she was extubated, *i.e.* before her endotracheal tube was removed. On September 9, 2003, Catherine was removed from ventilatory support and extubated. She suffered a cardiorespiratory arrest after this procedure. She required full CPR efforts and advanced life support measures, with chest compressions for greater than 20 minutes, before her circulation was restored. As a result of this arrest, she suffered severe, global, hypoxic-ischemic brain injury and is left with extremely poor neurologic functioning.

The cause of Catherine's arrest was a combination of glottic (structures of the vocal cords and adjacent tissue) and tracheal airway obstruction and continued hypoxemic respiratory failure.

I will treat these two issues, and the management of them, in separate discussions. Catherine had two risk factors for her airway obstruction, namely prolonged endotracheal intubation and excessive physical movement. The tracheal wall may become damaged with prolonged intubation by approximation of the semi-rigid endotracheal tube with the tracheal wall. There is repeated trauma to the tracheal wall, which reacts with inflammation and swelling. There was likely additional swelling caused by Catherine's excessive movements. The medical record makes note of Catherine's agitation and increased movement before extubation. Children of her age, and especially children with mental retardation, may thrash around, whipping their head from side-to-side in agitation a general response to the presence of the endotracheal tube, other invasive lines and devices, and relative immobility. Excessive movement of the head can cause the endotracheal tube to rub against the tracheal wall causing swelling and narrowing of the airway.

It may be difficult to determine in advance of extubation the extent to which prolonged intubation and movement-induced tracheal trauma has caused airway swelling; prudent practice dictates that an effort at such determination be made. A "leak test" of the airway can be of assistance in this determination. A leak test is performed by insufflating the airway and lungs with air at relatively high pressures and listening over the glottic airway for escape of air around the outside of the tube, suggesting open space between the wall of the trachea and the outer wall of

the endotracheal tube. Review of the respiratory therapy records reveals that the cuff on Catherine's endotracheal tube was in a deflated state before her extubation. Deflation of the tube cuff is the first step performed in the leak test when using the type of tube that Catherine had. However, there is no documentation that a leak test was performed nor is there any evidence that there was a leak around the patient's endotracheal tube with insufflation of the airway and lungs with the usual breaths delivered by the ventilator.

While the leak test is by no means "fool proof" in its determination of airway patency, the presence of a leak generally suggests lesser likelihood of airway obstruction, especially lesser likelihood of obstruction sufficient to cause respiratory arrest in the immediate post-extubation period. Treatment for suspected airway obstruction is usually to resedate the patient and wait until the situation is improved; minimization of head movements; and removal of excess body fluids if present and if thought to be contributing to the airway issue. Additionally, many practitioners administer steroids before extubation to reduce swelling. As Catherine had two risk factors for airway swelling, it is a breech of prudent practice to not at least attempt to determine if the airway is likely to be patent and to consider aborting the extubation attempt if significant airway narrowing is suspected.

The second condition that predisposed Catherine to cardiorespiratory arrest was her hypoxemic respiratory failure. The term refers to a diminished ability of the lung tissue to deliver oxygen to and remove carbon dioxide from the blood stream and the need for respiratory assistance. In Catherine's case, her hypoxemic respiratory failure had been severe and was the result of her pneumonia, but was improving at the time of her extubation. On the day of Catherine's extubation she required 50 to 60% oxygen while being supported on the ventilator. Her blood was mildly to moderately desaturated with, according to the medical record, saturations of the low to mid 90s, demonstrating that she absolutely required a moderately high level of oxygen support.

The practice ordinarily employed in the field of critical care for determining if a patient is ready for extubation, is to consider performing the procedure when they require 40% or less of oxygen. This standard is used for patients in whom the hypoxemia is the result of respiratory disease, as was the case with Catherine. Clinical practice has evolved to accept this cutoff of 40% as this amount of oxygen that can be reliably administered using usual devices, whereas greater concentrations cannot. Accordingly, patients, especially patients with severe respiratory failure, are weaned until they no longer require greater than 40% oxygen and then are extubated. Concentrations of oxygen greater than 40% can be delivered by CPAP or BiPAP, although it is frequently difficult to sustain an oxygen delivery of 60%, or even 50%.

To be assured that Catherine would receive a higher level of oxygen, she would have had to remain with virtually uninterrupted BiPAP. Tolerance of BiPAP can be difficult for a child as the BiPAP mask presses on the face. Such tolerance can be more difficult in a 10 year child with Down Syndrome as she may not understand the need for the device as readily as a child without this condition. In fact, a trial of BiPAP had been performed earlier in her hospitalization and she had become very agitated with the device. Her cooperation with the procedure could be by no means assured and without the device insufficient oxygen would have been delivered. Additionally on the morning of her extubation, Catherine had copious tracheal secretions requiring frequent suctioning of her airway. After extubation, she would have been required to cough such secretions out. Removal of her BiPAP device and interruption of her oxygen supply would have been required to clear secretions from her face or mouth. As her cooperation with BiPAP could not be assured and as interruption of BiPAP support should have been anticipated, extubation of Catherine while still requiring greater than 40% oxygen was a breech of good medical practice and constitutes negligence.

In the end, Catherine's cardiorespiratory arrest was the combination of a narrowed airway and continued need for moderate oxygen support. Her degree of airway narrowing would have required reintubation, but had she had less lung disease and less of an oxygen requirement, the maneuvers used before her extubation (hand ventilation with 100% oxygen) would have resulted in better delivery of oxygen to her bloodstream and tissues. It is likely that she could have sustained a longer period of time with the airway obstruction without cardiac arrest.

These events are regrettable, as is Catherine's outcome. Unfortunately, the results stem from a breech in care.


Sincerely,

Katherine Biagas, M.D.
Director, Pediatric Critical Care Medicine Fellowship
Assistant Professor of Clinical Pediatrics
Columbia University, College of Physicians and Surgeons
New York Presbyterian Hospital