**Children's Hospital of Pittsburgh**

Pediatric Critical Care Medicine

3705 Fifth Avenue
Pittsburgh, PA 15213-2583

Ph: (412) 692-5164
Fx: (412) 692-6076

Ann E. Thompson, MD
Director

Rajesh Aneja, MD
Hülya Bayir, MD
Joseph Carcillo, MD
Constantinos Chrysostomou, MD
Robert Clark, MD
Kathryn Felmet, MD
Melinda Fiedor, MD
Ericka Fink, MD
Patrick Kochanek, MD
Yi-Chen Lai, MD
Ricardo Munoz, MD
Richard Orr, MD
Shekhar Venkataraman, MD
R. Scott Watson, MD, MPH

RECEIVED
NOV 16 2005
McCARTER & ENGLISH
WILMINGTON, DE

November 12, 2005

Paul A. Bradley
McCarter & English, LLP
919 N. Market Street
Wilmington, Delaware 19899

RE: Catherine Laag, a minor vs A.I. DuPont Hospital for Children and others

Dear Mr. Bradley

    I am Pediatric Critical Care Specialist who is currently licensed to practice in the State of Pennsylvania. I am Board-Certified in both Pediatrics and the subspecialty of Pediatric Critical Care by the American Board of Pediatrics. I have been an Attending Physician in Pediatric Critical Care in the Pediatric Intensive Care Unit at Children since 1987. I am an Associate Professor in the Department of Critical Care at the University of Pittsburgh School of Medicine. I am also the Medical Director of Respiratory Care Services at the Children's Hospital of Pittsburgh. I have numerous publications and have been invited to speak on various topics both here in the USA and abroad.

    This letter outlines my findings in the above named case. The documents I have reviewed in preparing my report are as follows:

- Chest X-ray reports of 8/28, 8/29, 8/30, 9/2-9/10/2003
- Respiratory therapy flow sheets from 8/27/2003 to 9/10/2003 including blood gases
- Resuscitation flow sheet
- Critical Care Progress Notes from 8/28/2003 to 9/11/2003
- Nurses Notes from 9/7/2003 to 9/10/2003
- Defendant's Expert Report of Bradley P. Fuhrman M.D.
- Defendant's Expert Deposition of Bradley P. Fuhrman M.D.
- Plaintiff's Expert report of Katherine Biagas M.D.

- Plaintiff's Expert report of Stephen Lieberman M.D.
- Plaintiff's Expert deposition of Stephen Lieberman M.D.
- Deposition of Edward J. Cullen, Jr. D.O
- Deposition of Caroline Boyd M.D.
- Deposition of Cheryl Martinenza R.N.

Case summary from admission to 9/9/2003

Catherine Laag was a 10 yr old female with Trisomy 21 who was to admitted on the 27th of August, 2003 to A.I. Dupont Hospital with mycoplasma pneumonia. She was initially treated with supplemental oxygen by facemask. But, her respiratory status worsened and she was tried on noninvasive mechanical ventilation with nasal BiPAP (Bi-Level Positive Airway Pressure) starting around 0015 hrs on 8/28/2003. From the records, it appears that she tolerated the BiPAP on the morning of 8/28/2003. As the day progressed, her respiratory status worsened and did not improve despite an increase in BiPAP settings nor switching to facemask BiPAP. Therefore, Dr. Cullen intubated her on 8/29/2003 with a 6.0 cuffed endotracheal tube. She was initially placed on conventional mechanical ventilation. Due to worsening oxygenation failure, she was switched to high frequency ventilation on 9/1/2003. Until she was switched to high frequency ventilation, it appears that she was only sedated. Once she was on high frequency ventilation, she was sedated and additionally paralyzed with neuromuscular blocking agents. She was switched back to a conventional ventilator on 9/5/2003 and was placed on Pressure-Regulated Volume Control mode of ventilation. On 9/7/2003, she was changed to Synchronized Intermittent Mandatory Ventilation (Volume-regulated) with pressure-support. Her neuromuscular blockade was also discontinued on 9/7/2003. She was weaned on SIMV+PS down to a rate of 10/min, PEEP of 6, FiO2 0.5, and a Pressure-support level of 10 cms of water by the morning of 9/9/2003.

It is my opinion that Catherine Laag received aggressive and appropriate critical care from the time of admission to the morning of 9/9/2003. In this case, it is the care that she received on 9/9/2003 that is in question. My opinions about both the care that Ms. Laag received on 9/9/2003 and the issues raised by Drs. Biagas and Lieberman are discussed below.

Events of 9/9/2003

On 9/9/2003, she was extubated after a trial of CPAP and was immediately placed on Bi-PAP. She developed respiratory distress that did not improve despite oropharyngeal suctioning, sedation, and increasing the Bi-PAP support. A decision was made to emergently reintubate her. She required multiple attempts to intubate – the first attempt by Dr. Boyd, then by Dr. Cullen, then by 2 anesthesiologists and then by 2 ENT surgeons. She was successfully intubated using a 4.5 uncuffed endotracheal tube by the second ENT surgeon, Dr. Cook. During the attempts at intubation, she became hypoxemic and then sustained a cardiac arrest and required cardiopulmonary resuscitation. She was successfully resuscitated but unfortunately, is reported to have sustained significant brain damage.

The cause of her respiratory difficulty and the need for emergent reintubation was severe upper airway swelling. The proximate cause of her significant brain injury was the lack of

sufficient amounts of oxygen and blood flow to the brain that occurred during this unfortunate event.

In deciding to extubate a patient such as Ms. Laag, the first determination that must be made is that the patient's lung disease is improving and is expected to improve further with time. Ms. Laag's lung disease had improved such that on the morning of 9/9/2003, she was requiring about 50% inspired oxygen, on a rate of 10/min, a pressure-support level of 10, and a PEEP of 6. Over the preceding 48 hours, she had been weaned from a PEEP of 10 to 6, a rate of 20/min to 10/min, from a mean airway pressure of 16 cms to 10 cms, and from an FiO2 of 0.6 to 0.5. The PEEP had been reduced to 6 cms for at least 24 hours. The chest x-rays, despite showing significant improvement, still showed some residual lung disease. The data from the chart indicates that there was neither a substantial increase in the endtidal carbon dioxide or work of breathing nor a reduction in the oxygen saturation following that level of weaning. In fact, the data indicates that she was able to maintain her oxygenation and ventilation while she was being weaned. This would suggest that despite the appearance of the chest x-rays, the patient was able to tolerate the weaning performed over the previous 2 days.

When it has been determined that the patient's lung disease has progressed enough, certain other factors need to be considered before extubation. The first of these factors is that the patient is sufficiently awake. On 9/9/2003, a decision was made to discontinue propofol in anticipation for potential extubation. Propofol is a sedative that was started on 9/8/2003 as a continuous infusion as part of her sedation regimen. As per the nurses notes, propofol was discontinued at 1050 hrs and the patient was noted to be "arousing nicely" and later noted to be "responding to simple questions appropriately with head shakes". This indicates that she was sufficiently awake. The second factor is that the patient should have a reasonably good cough to bring up secretions that may collect in the tracheobronchial tree. The Respiratory Therapist's note from 9/9/2003 indicates that, prior to extubation she had a moderately strong cough.

The third factor is the issue of secretions and the need for suctioning. On 9/7/2003, while this child was still sedated and paralyzed, her frequency of suctioning was every 4 hours and the quality of the secretions were recorded as thin and white. Once her neuromuscular blocker Rocuronium, was stopped, she is reported to have become agitated. With that the quality of the secretions changed and became moderately thick. She was suctioned every 3 hours through the night of 9/7/2003 and during the day on 9/8/2003 with no change in her oxygen saturation or need for increased oxygen. During this time, it was noted that she was difficult to sedate and needed a dose of pentobarbitol to control her sedation. Due to the difficulty in maintaining her sedation, she was started on propofol which was successful in sedating her. In fact, her records indicate that she was deeply sedated with the dose of propofol that was prescribed for her. As soon as her sedation became more controlled, the quality of her secretions became small and white again. On the morning of 9/9/2003, when she became less sedated the quality of her secretions again changed to large and thick. She was suctioned 3 times after midnight before extubation. The last suctioning was a planned suctioning as indicated in the nurses notes. The fact that the quality of her secretions changed with the level of her sedation leads me to conclude that a major contributor for her secretions was the presence of the endotracheal tube irritating her airway. In my opinion, the frequency of suctioning noted in the records cannot be characterized as frequent enough to hold off extubation.

Other factors that need to be considered before extubation relate to the patient's ability to sustain spontaneous breathing and the level of support required to sustain the spontaneous effort once the patient is extubated. In September 2003, the practice in children included both extubation from a low level of ventilator support and after a trial of complete spontaneous breathing. At that time, there were 3 clinically accepted methods of assessing a patient's ability to sustain spontaneous breathing - a CPAP trial, a trial with minimal pressure support with low levels of PEEP, and a T-piece trial. In a CPAP trial, there is a constant level of airway pressure, usually 5 cms or lower applied to the airway. This can be accomplished either through the ventilator, through a special CPAP device, or using a Mapleson bag. Minimal pressure support with PEEP trial uses a low level of Pressure Support (between 5 and 8 cms) with a low level of PEEP (5 cms or lower). In a T-piece trial, sufficient flow of oxygen is provided without any positive airway pressure through the endotracheal tube. Generally, these trials can last anywhere from 30 minutes to 2 hours. During these trials, an assessment is made regarding the effort of breathing, the ability to maintain both oxygenation and ventilation, and any change in vital signs related to the test. If a patient can maintain adequate oxygenation and ventilation without excessive effort and with minimal changes in vital signs, then the patient is deemed to have passed the test. Passing this test implies that the patient can sustain spontaneous breathing after extubation. Despite passing the test for complete spontaneous breathing, some children do require reintubation. On the other hand, if the lung function is marginal or poor, then the patient would not be able to tolerate and pass this test. Intolerance of the trial of complete spontaneous breathing would be reflected by an increase in endtidal carbon dioxide level, work of breathing, respiratory rate and often associated with a fall in oxygen saturations. In September 2003, a CPAP trial would be an acceptable test to evaluate the patient's ability to breathe spontaneously. According to Dr. Cullen's note dated 9/9/2003 and the depositions of both Dr. Cullen and Dr. Boyd, Ms. Laag was subjected to a CPAP trial. Such a trial would be an appropriate standard of care prior to extubation considering the level of support that she was receiving on the morning of 9/9/2003. The exact duration of the CPAP trial is not clear from the records. Dr. Cullen's note on 9/9/2003 (timed 1410 hrs) reports that the patient had pulse oximeter saturations of greater than 93% on 50% oxygen with end-tidal carbon dioxide levels of 45-50 on CPAP of 5. The patient's arterial catheter had been discontinued the day before extubation. The records show that there was a good correlation between the arterial carbon dioxide and the endtidal carbon dioxide. So, the endtidal carbon dioxide level would be a reasonably good reflection of her arterial carbon dioxide. An endtidal carbon dioxide of 45-50 with pulse oximeter readings of greater that 93% on 5 cms of CPAP provides at least some indication that the patient was able to breathe effectively. It appears from both Dr. Boyd's and Dr. Cullen's depositions that the patient tolerated the CPAP trial. In addition, as per the Ms. Martinenza's deposition, it appears that they tried to optimize conditions for extubation by suctioning the endotracheal tube, administering albuterol and then hyperventilating and hyperoxygenating the patient just before extubation - all these would also be appropriate actions before extubation.

A child who is difficult to sedate poses a special problem. If they are under-sedated, they will thrash around and that increases the chance that they will have significant airway trauma. Oversedation will definitely prolong their duration of mechanical ventilation and increase the chance of infection, airway trauma, and drug-dependence. In these patients, the usual approach of slowly decreasing the sedation to allow more gradual spontaneous breathing has a high chance

of failure. Often, in such cases, patients may need to extubated as soon as they are awake enough to sustain spontaneous breathing. The trial of CPAP, in my opinion, demonstrates an attempt by Dr. Cullen to evaluate her ability to breathe spontaneously if she were extubated. The risk of reintubation has to weighed against the risk of heavy sedation, prolongation of mechanical ventilation, increased chances for airway injury and the increased chance for infection with the presence of the endotracheal tube. It appears that Dr. Cullen was faced with such a dilemma. Under these circumstances, well-qualified Pediatric Intensive Care Physicians can differ in their approach.

    Most commonly, patients are extubated and placed on supplemental oxygen without any positive pressure assistance. In some instances, it may be appropriate to extubate a patient to some level of noninvasive positive pressure support in addition to supplemental oxygen. Both approaches are acceptable standards of care. Based on the level of support she was receiving at the time of extubation, it is my opinion, that this child would have needed some level of positive pressure support with supplemental oxygen after extubation. She would have, most likely, not tolerated extubation to just supplemental oxygen without some form of positive airway pressure support. Despite his evaluation that she tolerated the CPAP trial, Dr. Cullen made the decision to place this patient on Bi-PAP immediately after extubation. This indicates that Dr. Cullen seemed to have recognized that Ms. Laag could not be extubated without needing some level of positive pressure support. On 9/9/2003, just prior to extubation, the nurse's notes indicate that the caretakers were "awaiting resp (I assume this means Respiratory Therapist) to set-up BiPAP and give additional albuterol to be followed by good sx (I assume it means suctioning) before we extubate". The nurses notes indicate that the patient was extubated around 1135 hrs and immediately placed on Bi-PAP by facemask and a good seal was obtained with the facemask.

    Soon after extubation, she developed respiratory distress that did not improve despite sedation and an increase in Bi-PAP support. Preparations seem to have been made immediately for an emergent reintubation. Dr. Boyd attempted intubating this patient first. Dr. Boyd states in her deposition that she noted redness and swelling and was unable to pass a 6.0 ETT through the vocal cords. Dr. Cullen took over and soon after called for help both to get the difficult airway cart and to call Anesthesiology and ENT. In my opinion, that was the perfectly appropriate action to take when one recognizes that this is going to be a difficult intubation. While it is clear that Dr. Cullen performed a direct laryngoscopy to intubate the patient, it is unclear whether he himself made any attempts at intubation per se. There is no doubt that this patient had severe airway swelling that made it difficult for even well-qualified physicians to reintubate her. It took several attempts by two Attending Anesthesiologists and ENT surgeons before she was successfully intubated. The fact that she was finally intubated with a 4.5 mm uncuffed tube also supports the diagnosis of severe airway swelling. It is known that airway mucosa can swell after extubation. The degree to which the airway can swell is variable between patients and cannot be predicted prior to extubation. The level of severe airway swelling that occurred in this patient after extubation is extremely rare and cannot be predicted.

Some Issues raised by both Dr. Biagas and Dr. Lieberman

    Both Drs. Biagas and Lieberman have raised the issue of a leak test. The leak test roughly correlates with the amount of space around the ETT. It is important to distinguish

between 2 types of endotracheal tube leaks. One is very obvious and easily heard at the bedside without using a stethoscope by even an inexperienced observer. The other is not so obvious and requires auscultation over the laryngeal area to appreciate a leak around the endotracheal tube. The reliability of a leak test has been tested only with uncuffed endotracheal tubes in children. Studies on the reliability of the leak test with uncuffed endotracheal tubes have yielded conflicting results with some reporting good reliability and others showing poor reliability. Moreover, a leak test yields completely different results depending on the position of the head and neck, the level of sedation and neuromuscular blockade, and the position of the endotracheal tube. There is also considerable variation between experienced observers in assessing leak pressures. It is also important to note that in all the studies that have examined the reliability of the leak test, all the patients have been extubated irrespective of the level of leak. The reliability of the leak test has not been tested sufficiently with cuffed endotracheal tubes in children. In this case, the cuff of the endotracheal tube was deflated for at least 24 hours before extubation. A leak test cannot measure the degree of swelling that may develop once the endotracheal tube is removed from the trachea. It is currently not a standard practice to administer corticosteroids to all patients prior to extubation. Studies on the prophylactic use of corticosteroids prior to extubation have yielded conflicting results. So, in my opinion, not administering corticosteroids in this patient prior to extubation would not be considered a breach of care.

   The radiology reports and Dr. Lieberman have referred to chest x-rays showing "hypoventilation". The term hypoventilation refers to a condition where the patient is taking ineffective breaths such that the carbon dioxide levels increase in the blood. Therefore, the term "hypoventilating or hypoventilation" cannot be used to describe the findings on a chest x-ray. The chest xray only offers a rough picture of the level of lung expansion. Lung volume appearance on chest x-rays are not reliable indicators of the actual lung volume. The level of lung expansion seen on a chest x-ray can vary depending on whether the chest x-ray was taken during inspiration or expiration. Chest x-rays takne during expiration will always tend to have less lung expansion than those done during expiration.

   Dr. Lieberman has also opined that "If swelling was as severe as asuggested by Dr. Fuhrman, then DuPont physicians wasted precious time with multiple intubation attempts instead of immediately attempting surgical intervention". Dr. Lieberman seems to be questioning both the diagnosis of severe airway swelling and the approach DuPont physicians took even if the diagnosis of severe airway swelling was true. There is no doubt in my mind that she had severe swelling as explained earlier. As to the second point, Pediatric Intensive Care Physicians do not have the training and expertise to perform a tracheostomy. To expect a Pediatric Intensive Care Physician to perform a surgical procedure to secure an artificial airway is asking them to perform way beyond their expertise. Neither am I aware that Pediatric Anesthesiologists have such training and expertise. Emergency tracheostomy for children in a tertiary care hospital is usually performed by either a Pediatric Surgeon or an ENT surgeon. Two ENT surgeons responded quickly to this crisis and chose to attempt intubation and the second surgeon was successful in placing a tube far smaller than the original endotracheal tube that was placed in this child. Not being able to perform a tracheostomy by a Pediatric Intensive Care Physician does not constitute a breach of care.

   In summary, it is my opinion, based on the information provided to me, that Catherine

Laag received a level of care that was well within the standard of care expected in a Pediatric Intensive Care Unit. It is unfortunate and regrettable that Catherine Laag has suffered significant brain injury.

Sincerely

Shekhar T. Venkataraman M.D.
Associate Professor, Departments of Critical Care Medicine and Pediatrics
University of Pittsburgh School of Medicine
Pediatric Intensivist, Children's Hospital of Pittsburgh
Medical Director, Respiratory Care Services, Children's Hospital of Pittsburgh
3705 Fifth Avenue, Room # 6831
Pittsburgh, PA 15213
Tel: 412-692-5164
e-mail: venkataramanst@ccm.upmc.edu