# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 848053 (E.D.Pa.)
(Cite as: 1998 WL 848053 (E.D.Pa.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Brent STRAMARA, Administrator of the Estate of
Christopher V. Stramara,
deceased,
v.
DORSEY TRAILERS, INC. Fred M. Ellmaker, Jr.
Administrator of the Estate of
Raymond Ellmaker, deceased and Melissa Risser,
Mother and Natural Guardian of
Raymond Michael Ellmaker and Rochelle Lynn
Ellmaker, Minor Children of the
deceased Raymond Ellmaker
v.
DORSEY TRAILERS, INC.
Nos. CIV. A. 96-CV-7361, CIV. A. 96-CV-7362.

Dec. 7, 1998.

*MEMORANDUM AND ORDER*

KELLY.

*1 Presently before the Court are a multitude of motions from both Plaintiffs and Defendant. Because of the volume of these motions, the Court will not summarize its rulings here but will provide a discussion and resolution of each below.

1. Defendant's Motion In Limine To Preclude Portions Of Trooper Steven Ward's Testimony (Document No. 65).

Defendant's first motion in limine concerns whether Pennsylvania State Trooper Ward may testify at trial regarding his opinion that the lack of retro-reflective material on the trailer contributed to the accident. This issue is an evidentiary one, and cannot be resolved as a matter of law on the pleadings before the Court. Therefore, Plaintiffs will have the opportunity to establish, outside of the jury's presence, that Trooper Ward is qualified under Rule 702 to present his opinion. Regarding Plaintiffs' contention that Trooper Ward alternatively may present his opinion under Rule 701, the Court will reserve ruling on this issue until trial, but will not permit testimony that is cumulative.

2. Defendant's Motion In Limine To Preclude Testimony That Retro-reflective Tape Would Have Prevented The Accident (Document No. 73).

Defendants next move to exclude Plaintiffs' expert testimony that retro-reflective tape would have prevented the accident. In support of this motion, Defendant curiously cites cases concerning failure to warn, although this is a design defect case, and the admissibility of expert testimony under Pennsylvania law, even though the rules of evidence in this case are governed by the Federal Rules of Evidence. Equally peculiar is Defendant's contention that because no one who rode in Mr. Stramara's car on the night of the accident can provide eyewitness testimony, there is no factual basis on which Plaintiffs' experts can base their opinion. This argument unfortunately ignores Rule 703, which permits experts to state opinions based upon facts or data reasonably relied upon by experts in a given field. Fed.R.Evid. 703 advisory committee's notes; *see also Daubert v. Merrill Dow Pharm.*, 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Accordingly, the testimony of Plaintiffs' experts will be admissible, at least as far as the factual basis for their opinions is concerned, if it meets this standard. *Cf. Sementilli v. Trinidad Corp.*, No. 96-16034, 1998 WL 784675, at *5 (9th Cir. Nov.12, 1998) (finding the fact that expert was not present at the accident scene and not privy to plaintiff's thought processes did not render the expert's testimony inadmissible). Defendant, of course, will have the opportunity to voir dire and cross-examine these experts to ensure the Rule 703 standard is met.

3. Defendant's Motions In Limine To Preclude Evidence Relating To 1993 Safety Standards And Prior Accidents Involving Defendant's Trailers (Document Nos. 64 and 66).

Defendant also seeks to exclude evidence relating to 1993 safety standards from evidence, and moves to exclude any evidence relating to prior accidents involving trailers Defendant manufactured, where plaintiffs subsequently claimed the trailers should have been equipped with the retro-reflective tape. In both cases Defendant argues the evidence is irrelevant to Plaintiff's design defect case and is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                               Page 2
Not Reported in F.Supp.2d, 1998 WL 848053 (E.D.Pa.)
**(Cite as: 1998 WL 848053 (E.D.Pa.))**

prejudicial. Defendant also argues, again relying on Pennsylvania law, that the evidence of prior accidents is inadmissible hearsay, and that Plaintiffs' expert has based his opinion on it.

*2 Defendant persists in failing to recognize, despite Plaintiffs' frequent statements in the pleadings, that the evidence concerning the safety standards and prior accidents is intended to demonstrate Defendant's knowledge, and therefore is relevant to Plaintiffs' negligence claims. [FN1] With respect to Defendant's claim that the evidence on which Plaintiffs' expert relies is inadmissible hearsay, this argument ignores Federal Rule of Evidence 703. Accordingly, Defendant's objections to the safety standard and prior accident evidence are without merit, and Defendant's motions are denied.

> FN1. Further, Plaintiffs have provided sufficient information about the prior accidents for the Court to conclude the accidents were substantially similar. *See Barker v. Deere & Co.*, 60 F.3d 158, 163 (3d Cir.1995). As Plaintiffs stated, each accident involved a Dorsey trailer not equipped with retro-reflective tape, each occurred under dark conditions, and each involved an automobile under-riding the side of the trailer. (Pls.' Resp. Mot. in Limine Def. To Preclude Evid. of Other Accidents, at 2.)

4. Defendant's Motion In Limine To Preclude The Use Of A Videotape And Photographs Of The Deceased At The Accident Scene (Document No. 63).

Defendant additionally moves to exclude from evidence a videotape Plaintiffs' expert created. Plaintiffs claim they intend to use this video to demonstrate the difference between conspicuity and visibility. Defendant objects to the use of the video because Plaintiffs' expert shot the video while driving toward a trailer with the retro-reflective tape on a direct path, whereas Mr. Stramara approached the trailer in question on a curve of fifty-one degrees, and the expert drove his vehicle at half the speed at which Mr. Stramara allegedly drove his car. [FN2] These difference are critical; the speed at which Mr. Stramara approached the trailer and the angle of his approach very likely will inform the jury's decision regarding how useful the retro-reflective tape would have been, and a more direct view of a retro-reflective-taped trailer at a slower speed therefore would be prejudicial. *Contra Dorsett v. American Isuzu Motors, Inc.*, 805 F.Supp. 1212, 1228-29 (E.D.Pa.), *aff'd* 977 F.2d 567 (3d Cir.1992). [FN3] Finally, the Court will reserve judgment on the admissibility of photographs depicting the decedent at the accident scene.

> FN2. Plaintiffs estimate Mr. Stramara drove his car into the trailer at a speed of 40 mph; Defendant estimates the vehicle Plaintiffs used to film the video traveled at 18 mph.

> FN3. Based upon the General Investigation Report, it appears that although he did approach the trailer on a curve, Mr. Stramara had a direct view of the trailer for 660 feet. (General Accident Rep. at 10, 17-19.) Nevertheless, at no point was Mr. Stramara's car perpendicular to the trailer's position, and therefore the differences between the video and what actually occurred remain substantial.

5. Defendant's Motion For Reconsideration Of The Court's October 28, 1998, Ruling (Document No. 72).

Defendant also urges the Court to reconsider its October 28, 1998, ruling, in which the Court denied Defendant's motion for partial summary judgment on Plaintiffs' punitive damages claim. In that motion, Defendant directed its argument to Plaintiffs' strict liability claim, and claimed that punitive damages could not be assessed in that type of action. The Court ruled that Defendant's conclusion was incorrect, *see Stramara v. Dorsey Trailers, Inc.*, No. 96-CV-7361, 1998 WL 754746, at *2 (E.D.Pa. Oct.28, 1998) (citing cases); *see also Walton v. Avco Corp.*, 530 Pa. 568, 610 A.2d 454, 459 (Pa.1992) (holding manufacturers can be found strictly liable for failing to warn their product's users of subsequently learned defects), and pointed out that Defendant substantially failed to address Plaintiffs' negligence claims, *see Stramara*, 1998 WL 754746, at *1. In its "Motion for Reconsideration," Defendant now focuses on those negligence claims. This motion, however, does not revisit areas previously discussed in the motion for partial summary judgment. Rather, this motion raises entirely new arguments concerning Plaintiffs' negligence claims, which Defendant declined to address earlier. Accordingly, this is a separate motion for partial summary judgment, and it is untimely. In the Court's September 18, 1998, Order, the Court explicitly set a deadline of seven days from that Order for the parties to file dispositive motions. The Court, therefore, will not entertain this motion, regardless of the merit of the arguments within it. Defendant's motion is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d																																Page 3
Not Reported in F.Supp.2d, 1998 WL 848053 (E.D.Pa.)
**(Cite as: 1998 WL 848053 (E.D.Pa.))**

denied.

6. Defendant's Motion In Limine To Preclude Evidence Of The Car's Brake Light (Document No. 62).

*3 Defendant lastly moves to preclude Plaintiffs from introducing evidence about the brake light in Mr. Stramara's car. Specifically, Defendant alleges that even if a brake light is activated, it doesn't necessarily show the car's operator applied the brake. Defendant further alleges the evidence of the brake light should be excluded because Plaintiffs failed to store the car so that Defendant could examine it.

With respect to Defendant's first argument, it will be for the jury to decide whether an activated brake light is significant in any way. Also, regarding the spoilation argument, because Defendant's expert seems able to testify that an activated brake light does not mean the car's driver applied the brake, Defendant does not appear to have been prejudiced by not being able to inspect the car. See *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir.1994). Defendant's motion, therefore, is denied.

7. Plaintiff's Motion To Preclude Evidence About The Illegitimacy Of Plaintiff's Decedent's Children (Document No. 28).

Plaintiff Ellmaker moves to have evidence that the decedent's children were illegitimate excluded from evidence on the grounds that evidence is irrelevant and inadmissible. Defendant claims decedent's paternity never has been proven, and it is entitled to present evidence of illegitimacy to the jury on the issue of damages suffered by the children. The Court agrees that this evidence is relevant for the reason urged by Defendant, and Plaintiff's motion is denied. The Court cautions Plaintiff, however, that the Court will not permit Plaintiff to offer damages testimony until it establishes the decedent's paternity.

8. Plaintiff's Motion To Preclude Testimony Of The Alleged HIV Status Of Plaintiff's Decedent (Document No. 59).

Plaintiff Stramara requests that any reference to Mr. Stramara being HIV positive be excluded from evidence. Plaintiff admits Mr. Stramara's medical records contain one reference to him being HIV positive, but that the physician who entered this in the medical record now claims he was mistaken. Plaintiff further argues, and Defendant agrees, that Defendant has no other evidence that contradicts the physician's claim. The Court will reserve ruling on this issue until the time of trial. [FN4]

> FN4. The parties took physician's deposition only recently, and Defendant requested leave to amend its response to this motion while that deposition is transcribed.

9. Plaintiffs' Motion In Limine To Preclude Evidence Of Mr. Stramara's Methamphetamine Addiction And Regular Drinking Of Alcohol (Document No. 69).

Plaintiffs move to preclude any reference at trial to Mr. Stramara's prior methamphetamine addiction or his regular consumption of alcohol. Plaintiffs argue that this evidence is highly prejudicial, which it is, and that the evidence is irrelevant. This latter argument is unpersuasive because Plaintiffs intend to introduce evidence relating to Mr. Stramara's life expectancy, and Mr. Stramara's physical condition as a result of his indulgences therefore obviously is relevant. Further, this relevance outweighs the prejudicial effect of the evidence. *Cf. Cook v. American S.S. Co.,* 53 F.3d 733, 743 (6th Cir.1995); *Kraus v. Taylor,* 710 A.2d 1142, 1143-45 (Pa.Super.Ct.1998). Plaintiffs' final argument is that the evidence of the effect drug and alcohol use would have on life expectancy must be introduced through expert testimony, and because Defendant has not announced its intention to have any such expert testify, Defendant should be prohibited from introducing this evidence. While Defendant does not have any such expert on its witness list, it still may cross-examine Plaintiffs' experts about whether their calculations considered Mr. Stramara's recreations or, if they did not, how their calculations would change. Defendant may conduct this cross-examination, however, only after it establishes a factual foundation that Mr. Stramara was addicted to methamphetamine and drank alcohol regularly, and to excess. To ensure Defendant has established this factual basis, the Court instructs counsel to consult with the Court before proceeding with this cross-examination. With these safeguards in place, Plaintiffs' motion is denied.

10. Plaintiffs' Motions In Limine To Preclude The Testimony Of Several Of Defendant's Expert Witnesses (Document Nos. 60, 70, and 71).

*4 Plaintiffs also move to preclude several of Defendant's experts from testifying at trial. Plaintiffs' first motion concerns David Kemp, P.E., whom Plaintiffs state does not consider himself to be an expert in the area of "trailer conspicuity." In their second motion, Plaintiffs seek to prevent Erich

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 4
Not Reported in F.Supp.2d, 1998 WL 848053 (E.D.Pa.)
**(Cite as: 1998 WL 848053 (E.D.Pa.))**

Phillips, Ph.D., from testifying because they claim he doesn't possess sufficient expertise in the area of what effect alcohol has on an intoxicated person's reaction time. Finally, Plaintiffs move to bar Francis Weir, Ph.D., from testifying based on their claims that no evidence exists that Messrs. Young or Enck were drunk at the time of the accident and he will act as a mere conduit for the introduction of Mr. Stramara's blood alcohol concentration ("BAC"). The Court finds none of these objections to be persuasive. To the extent Plaintiffs believe an expert lacks sufficient qualifications to testify, or believes the expert's methodology was faulty, Plaintiffs can cross-examine that expert at trial. Each expert, however, apparently possesses technical knowledge that will assist the jury, and, if qualified at trial, will be permitted to testify. See Fed.R.Evid. 702; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir.1994), cert. denied, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). Accordingly, Plaintiffs' motions are denied.

11. Plaintiffs' Motion In Limine To Preclude Testimony Regarding Mr. Stramara's Blood Alcohol Concentration Or Alcohol Consumption On The Day Of The Accident (Document No. 67).

Plaintiffs additionally move to exclude from evidence any reference to Mr. Stramara's BAC or alcohol consumption on the day of the accident. Plaintiffs claim this evidence is inadmissible because there is no evidence that Mr. Stramara operated his car in an unfit manner, and further argue that the BAC was unreliable. Moreover, they believe any evidence of intoxication is irrelevant to Plaintiffs' strict liability and negligence claims.

The Court will address Plaintiffs' inadmissibility claim first. The admissibility of this evidence is determined by Pennsylvania law, Rovegno v. Geppert Bros., Inc., 677 F.2d 327, 329 & n. 3 (3d Cir.1982), which permits juries to hear evidence of drinking or intoxication only when it is relevant to the issue of the reckless or careless operation of an automobile and it "reasonably establishes" intoxication that left the car operator unfit to drive, Fisher v. Dye, 386 Pa. 141, 125 A.2d 472, 476 (Pa.1956). Plaintiffs attempt to distinguish cases in which courts have admitted this evidence by declaring, almost disingenuously, that "[i]n the case at bar, there is no evidence of unfitness to drive." (Pls.' Mem. Supp. Mot. In Limine, at 10.) Plaintiffs claim that the two surviving passengers in Mr. Stramara's car, Bernell Young and James Enck, "observed that he was a prudent and cautious driver on the night in question." Id.

*5 To the contrary, there is substantial evidence, provided in large part by Messrs. Young and Enck, that Mr. Stramara was intoxicated when the accident occurred. Mr. Young reported to Trooper Brian Knorr that "everyone was drinking beer," (Knorr Dep. at 24-25), and Mr. Enck reported to Trooper Knorr that those in the car, including Mr. Stramara, "were drunk before they picked me up," (Knorr Dep. at 18; Police Accident Rep. at 6; see also Enck Dep. of 5/02/96, at 13 ("Chris [had] a beer in his hand."). Trooper Michael Keyes, Corporal Steven Ward, Trooper Richard Townsend, Misa Cuzmici, Rodney Nissley, Donald Root, and Harold Ulmer all smelled alcohol coming from Mr. Stramara's car. (Keyes Dep. at 20; Ward Dep. of 8/18/97, at 42; Townsend Dep. at 46; Cuzmici Dep. at 68; Nissley Dep. at 49-50; Root Dep. at 59; Ulmer Statement at 4.) Trooper Keyes, Corporal Ward, Mr. Cuzmici, and Bruno Schmalhofer observed beer cans, both empty and full, in the car. (Keyes Dep. at 21, 41; Ward Dep. of 8/18/97, at 42; Cuzmici Dep. at 66-68; Schmalhofer Dep. at 42). Moreover, Trooper Keyes and Corporal Ward both saw beer cans in the immediate area of Mr. Stramara. (Keyes Dep. at 41; Ward Dep. of 10/18/96, at 38.)

Further seeking to distinguish their case, Plaintiffs emphasize that there is no evidence that Mr. Stramara in excess of the speed limit. [FN5] Despite this relatively moderate rate of speed (Plaintiffs claim Mr. Stramara was driving at 40 mph), neither Trooper Keyes or Corporal Ward observed any markings on the road that would show Mr. Stramara tried to avoid the trailer either by decelerating or maneuvering his car, and neither surviving passenger could recall any deceleration or maneuvers, either. (Keyes Dep. at 30; Ward Dep. of 8/18/97, at 66; Police Accident Rep. at 11; Gen. Investigation Rep. of 12/01/94, at 1; Enck Dep. of 9/12/97, at 33-34; Young Dep. at 66.) The significance of this fact is heightened by Corporal Ward's conclusions that the trailer could be directly viewed for approximately 660 feet, which Corporal Ward estimated would have given Mr. Stramara ten seconds to avoid the trailer. (Gen. Investigation Rep. of 12/01/94, at 9-10.) Plaintiffs undoubtedly will claim that Mr. Stramara's failure to perform any evasive maneuvers shows how necessary the retro-reflective tape was, but that argument is for the jury to consider; the Court finds this evidence is probative of whether Mr. Stramara was an unfit driver.

> FN5. The Police Accident Report lists the speed at which Mr. Stramara was driving as a possible violation (Police Accident Rep. at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 848053 (E.D.Pa.)
(Cite as: 1998 WL 848053 (E.D.Pa.))

Page 5

5), but neither party cites this in their memoranda, and so the Court will analyze this issue as if Mr. Stramara was driving at a safe rate of speed.

In addition to this evidence, Defendant is prepared to offer expert testimony that Mr. Stramara was not fit to drive his car at the time of the accident. Plaintiffs challenge the validity of this opinion on the grounds that the process by which the BAC was determined may have been flawed and that the expert, Francis Weir, Ph.D., lacks personal knowledge. Neither challenge is compelling. Plaintiffs' allegations that the BAC was inaccurate can be raised at trial, and under Federal Rule of Evidence 703 an expert is not required to have personal knowledge when rendering an opinion.

*6 Finally, the BAC itself provides strong evidence that Mr. Stramara was intoxicated and unfit to drive at the time of the accident. While this evidence alone cannot raise a presumption that Mr. Stramara was unfit, *Billow v. Farmers Trust Co.*, 438 Pa. 514, 266 A.2d 92, 93 (Pa.1970), it may be considered when determining whether a driver was unfit due to intoxication, *see, e.g. Magner v. Associated Ins. Co.*, No. 93-1932, 1995 WL 29045, at *3, *7 (E.D.Pa. Jan.26, 1995); *Surowiec v. General Motors Corp.*, 448 Pa.Super. 510, 672 A.2d 333, 336 (Pa.Super.Ct.1996); *Gallagher v. Ing*, 367 Pa.Super. 346, 532 A.2d 1179, 1182 (Pa.Super.Ct.1987), *appeal denied*, 519 Pa. 665, 548 A.2d 255 (Pa.1988). In light of the BAC, Defendant's expert testimony, and the strong testimonial evidence that Mr. Stramara was unfit to drive his car on the evening of the accident due to intoxication, the Court finds that the evidence of his BAC and drinking before the accident is admissible. *Cf. Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, No. 98-1163, 1998 WL 811573 (1st Cir. Dec.1, 1998).

Plaintiffs alternatively argue that if this evidence is admissible, it is not relevant to either their negligence claims or their strict liability claims. The Court finds little merit in either contention. Plaintiffs' claim that the evidence is irrelevant to the negligence claims is based on their reading of *Crowell v. City of Philadelphia*, 531 Pa. 400, 613 A.2d 1178 (Pa.1992), which Plaintiffs liberally read to support their claim that alcohol impaired drivers are foreseeable and therefore cannot constitute an intervening or superseding cause. Therefore, they reason, this evidence cannot be introduced to address proximate cause and thus is irrelevant. The problem with this argument begins with the fact that *Crowell* does not stand for the cited proposition. In *Crowell*, the court merely held that where a jury explicitly found that two defendants acted negligently and were substantial causes of the injuries suffered, the jury's verdict could not be interpreted as finding that one defendant's conduct was only a link in the causal chain. *Id.* at 1184. In addition to the lack of supporting case law, Mr. Stramara's conduct plainly may have interrupted any causal connection that existed between Defendant's conduct and Plaintiffs' injuries. The Court therefore finds the evidence of Mr. Stramara's intoxication is relevant to Plaintiffs' negligence claim.

The Court also finds this evidence is relevant to Plaintiffs' strict liability claim. While strict liability cases should not involve negligence concepts, a plaintiff must prove a product's defect was the proximate cause of his injuries. *Madonna v. Harley Davidson, Inc.*, 708 A.2d 507, 508 (Pa.Super.Ct.1998). The inverse of this statement is equally true: a defendant may introduce evidence that tends to show his product was not the proximate cause of the plaintiff's injuries. Accordingly, in *Alexander v. Carlisle Corp.*, 449 Pa.Super. 416, 674 A.2d 268 (Pa.Super.Ct.1996), the court held that where the plaintiff put his physical condition in issue by claiming he had been injured by exposure to asbestos, the trial court properly admitted evidence that alcohol consumption may have caused his liver cirrhosis. *Id.* at 271. Similarly, Plaintiffs have put Mr. Stramara's ability to perceive in issue by claiming the accident would not have occurred if Defendant equipped its trailer with retro-reflective tape. The evidence of Mr. Stramara's intoxication therefore is relevant to how much, if at all, the retro-reflective tape would have helped Mr. Stramara avoid the accident. Plaintiffs' motion is denied.

12. Plaintiffs' Motion In Limine To Preclude Testimony Regarding Mr. Stramara's Suspended Driver's License (Document No. 68).

*7 In their final motion in limine, Plaintiffs move to prevent any reference to the fact that on the date of the accident, Mr. Stramara drove his car while his driver's license was suspended. Defendant claims this evidence is relevant to an additional theory of causation, that if he hadn't gotten behind the wheel of his car that day, he wouldn't have been involved in the accident. While Mr. Stramara obviously wouldn't have been in a car accident if he hadn't been in a car, the Court finds this argument comes up a little short as a theory of causation. Further, the enormous prejudice this evidence would visit on Plaintiffs

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 1998 WL 848053 (E.D.Pa.)  
**(Cite as: 1998 WL 848053 (E.D.Pa.))**

Page 6

outweighs whatever relevance the evidence presents. *See* Fed.R.Evid. 403. Accordingly, Plaintiffs' motion is granted.

An Order follows.

### ORDER

AND NOW, this 7th day of December, 1998, upon consideration of Plaintiffs' motions and Defendant's responses thereto, and Defendant's motions and Plaintiffs' responses thereto, it is hereby ORDERED:

1. The Court's ruling on Defendant's Motion In Limine To Preclude Portions Of Trooper Steven Ward's Testimony (Doc. No. 65) is deferred until the time of trial;

2. Defendant's Motion In Limine To Preclude Testimony That Retro-reflective Tape Would Have Prevented The Accident (Doc. No. 73) is DENIED;

3. Defendant's Motions In Limine To Preclude Evidence Relating To 1993 Safety Standards And Prior Accidents Involving Defendant's Trailers (Doc. Nos. 64 and 66) are DENIED;

4. Defendant's Motion In Limine To Preclude The Use Of A Videotape And Photographs Of The Deceased At The Accident Scene (Doc. No. 63) is GRANTED with respect to the videotape, and the Court will defer its ruling on the photographs until the time of trial;

5. Defendant's Motion For Reconsideration Of The Court's October 28, 1998, Ruling (Doc. No. 72) is DENIED as untimely;

6. Defendant's Motion In Limine To Preclude Evidence Of The Car's Brake Light (Doc. No. 62) is DENIED;

7. Plaintiff's Motion To Preclude Evidence About The Illegitimacy Of Plaintiff's Decedent's Children (Doc. No. 28) is DENIED;

8. The Court's ruling on Plaintiff's Motion To Preclude Testimony Of The Alleged HIV Status Of Plaintiff's Decedent (Doc. No. 59) is deferred until the time of trial;

9. Plaintiffs' Motion In Limine To Preclude Evidence Of Mr. Stramara's Methamphetamine Addiction And Regular Drinking Of Alcohol (Doc. No. 69) is DENIED;

10. Plaintiffs' Motions In Limine To Preclude The Testimony Of Several Of Defendant's Expert Witnesses (Doc. Nos. 60, 70, and 71) are DENIED;

11. Plaintiffs' Motion In Limine To Preclude Testimony Regarding Mr. Stramara's Blood Alcohol Concentration Or Alcohol Consumption On The Day Of The Accident (Doc. No. 67) is DENIED; and

12. Plaintiffs' Motion In Limine To Preclude Testimony Regarding Mr. Stramara's Suspended Driver's License (Doc. No. 68) is DENIED.

Not Reported in F.Supp.2d, 1998 WL 848053 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:96cv07362 (Docket) (Oct. 31, 1996)

• 2:96cv07361 (Docket) (Oct. 31, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Case 1:04-cv-01306-GMS   Document 72-2   Filed 12/08/2005   Page 8 of 19

# BUNIN ASSOCIATES
### Actuarial-Economic Consultants

DAVID T. BUNIN, FSA  
ROYAL A. BUNIN, MBA

THE WYNNEWOOD HOUSE, SUITE 109  
300 EAST LANCASTER AVENUE  
WYNNEWOOD, PA 19096

PHONE: (610) 642-4700  
FAX: (610) 642-4787  
E-Mail: BuninAssoc@aol.com

June 30, 2005

Robert N. Hunn, Esq.  
**Kolsby, Gordon, Robin, Shore & Bezar**  
One Liberty Place  
1650 Market Street, 22nd Floor  
Philadelphia, PA 19103

**RE:  Catherine Laag**

Dear Mr. Hunn:

This is our actuarial-economic report on Catherine Laag. All opinions expressed in this report are held to a reasonable degree of actuarial and economic certainty. Upon receiving any additional information, we will amend our report accordingly.

You have asked us to perform an actuarial-economic analysis with respect to the future cost of care which Catherine will require for the rest of her lifetime. According to the article entitled "The Changing Survival Profile of People With Downs Syndrome: Implications for Genetic Counseling", as presented in <u>Clinical Genetics</u>, the median survival age for such individuals was to age 58.6. Twenty-five percent of the case studies lived to an average age of 52.9 years, and the oldest person in the study lived to age 70 years. For purposes of this report, a total life span of 58.6 years will be utilized in calculating the future medical costs for care and attention which Catherine will require. She was born on August 22, 1993 and is, therefore, currently 11.8 years of age. Based upon a total life span of 58.6 years, this would result in a life expectancy from the current date of an additional 46.8 years. Accordingly, adding the additional life expectancy of 46.8 years to the current age of 11.8 years would result in the life span as indicated in the above article of 58.6 years. It should be indicated that the normal life expectancy for an 11 year old female, based upon the 2002 U.S. Life Tables, prepared by the U.S. Department of Health and Human Services, would be an additional 69.5 years. Adding the normal life expectancy of 69.5 to the current age of 11.8 years would result in an expected life span of 81.3 years. As indicated above, calculations presented herein will be based upon the current life expectancy of 46.8 years, which would, therefore, result in a total life span to age 58.6 years.

Robert N. Hunn, Esq.
**Kolsby, Gordon, Robin, Shore & Bezar**
RE: Catherine Laag
June 30, 2005
Page 2
_____

    Presented for our review was the Life Care Plan Report, prepared by Betsy Bates, BSN, CRRN, CCM, dated April 29, 2005. We have utilized the information contained in Nurse Bates' report, along with governmental statistics and financial data to calculate the present value of the future medical expenses. As indicated in Nurse Bates' report, Catherine has been diagnosed with hypoxic ischemic encephalopathy, ventilator dependency, and Downs Syndrome.

    After presenting Catherine's medical history, including a description of the incident that gave rise to her current disability, which occurred in September of 2003, Nurse Bates described Catherine's therapy and her current medical treatment. The Functional Nursing Assessment in Nurse Bates' report indicates that Catherine is fed via a gastrostomy tube, and that she is non-verbal but is sensitive to loud noises. She breathes with a tracheostomy, is bowel and bladder incontinent, and is totally dependent upon others for all activities of daily living. She is carried and transferred by her caregivers as she cannot sit independently, nor walk. Her cognitive impairment is severe, globally, neurologically devastating. Her father has custody of her care, and Catherine currently attends the Bancroft School at Voorhees.

    Nurse Bates goes on to present her recommendations on the following categories:

    1.  Medical Care
    2.  Nursing Care/Facility Placement
    3.  Case Management
    4.  Therapies
    5.  Durable Medical Equipment
    6.  Medical Supplies
    7.  Medications
    8.  Transportation
    9.  Accessible Housing
    10. Psychological Care

    Nurse Bastes presented three scenarios in her report. The first scenario was based upon home care with 24 hour skilled nursing services. The second scenario was based upon facility placement, utilizing actual charges. The third scenario was also based upon facility placement, utilizing the current contract rate at the Voorhees Pediatric Center.

Robert N. Hunn, Esq.
**Kolsby, Gordon, Robin, Shore & Bezar**
RE:  Catherine Laag
June 30, 2005
Page 3

    The calculations presented in this report will be shown on a year-by-year basis, with the first year actually being slightly longer, and incorporating the period from Catherine's current age of 11.8 until the end of her 12th year.  Year two presents calculations based upon Catherine being 13 years of age.  The third year presents the present value of calculations at 14 years of age, etc., with the last year of the analysis actually being slightly less than one year, showing the present value of the future medical costs, measured from age 50 to age 58.6.  This would coincide with a life expectancy of 46.8 additional years, measured from the current age of 11.8 years, and therefore resulting in a total life span of 58.6 years.  The asterisk next to the year 47 refers to this year being a partial year, as described above.

    In calculating the future medical costs, and cost of care, allowances are made for increases due to inflation and medical inflation. According to the Consumer Price Index (CPI-U), prepared by the U.S. Department of Labor, Bureau of Labor Statistics, the average rate of inflation for the first five months of 2005 has been at the rate of approximately 3% per year.  This rate of inflation would apply to all items contained in the Consumer Price Index.  The rate of inflation for medical care services for the 12 month period ending May 2005 was at the rate of 5% per year. Accordingly, those items listed in Nurse Bates' report which would refer to a medical care service will be increased annually at the rate of 5% per year. Those non-medical expenses, such as transportation, etc. will be increased with an inflationary rate of 3% per year.  The future medical expenses and care needs, which have been increased due to the effects of inflation, would also need to be reduced to its present value.  Based upon current and historic rates of return, and the length of discounting of 30 years, an appropriate discount rate would be 4.5%.  As of June 22, 2005, the rate of return on government securities was less than 4.5%.  Specifically, the 30-year Bond had a rate of return of 4.23% per year, the 10-year Note had a rate of return of 3.9% per year, the 2-year Note had a rate of return of 3.6%, while the 3-month Treasury Bill had a rate of return of 3.07% per year.  According to information published by MunicipalBond.com, as of June 21, 2005, the rates of return of Municipal Bonds issued by the State of Delaware have yield to maturity rates between 2.5% to 4.5%, with original coupon rates of between 4% to 6%.

Robert N. Hunn, Esq.
**Kolsby, Gordon, Robin, Shore & Bezar**
RE:  Catherine Laag
June 30, 2005
Page 4

    Our analysis follows on our Summary Pages.  The future medical costs which have increases due to the effects of medical inflation and general inflation, and reduced to present value, are shown on a year-by-year basis, with cumulative totals shown in the far right column.

    Please let us know if you have any questions.

                          Very truly yours,

                          Royal A. Bunin, M.B.A.

                          David T. Bunin, F.S.A.

RAB:DTB/gk

Catherine Laag

## SCENARIO #1: Homecare with Nursing Services

| Year | AGES: From | To | Annual PV Total | Cumulative Totals |
|---|---|---|---|---|
| 1 | 11.8 | 13 | $743,403 | $    743,403 |
| 2 | 13 | 14 | $602,169 | $ 1,345,572 |
| 3 | 14 | 15 | $602,386 | $ 1,947,958 |
| 4 | 15 | 16 | $602,643 | $ 2,550,601 |
| 5 | 16 | 17 | $602,938 | $ 3,153,539 |
| 6 | 17 | 18 | $603,272 | $ 3,756,811 |
| 7 | 18 | 19 | $603,644 | $ 4,360,455 |
| 8 | 19 | 20 | $604,054 | $ 4,964,509 |
| 9 | 20 | 21 | $604,501 | $ 5,569,010 |
| 10 | 21 | 22 | $604,986 | $ 6,173,996 |
| 11 | 22 | 23 | $604,867 | $ 6,778,863 |
| 12 | 23 | 24 | $605,422 | $ 7,384,285 |
| 13 | 24 | 25 | $606,012 | $ 7,990,297 |
| 14 | 25 | 26 | $606,639 | $ 8,596,936 |
| 15 | 26 | 27 | $607,302 | $ 9,204,238 |
| 16 | 27 | 28 | $608,000 | $ 9,812,238 |
| 17 | 28 | 29 | $608,732 | $10,420,970 |
| 18 | 29 | 30 | $609,500 | $11,030,470 |
| 19 | 30 | 31 | $610,302 | $11,640,772 |
| 20 | 31 | 32 | $611,137 | $12,251,909 |
| 21 | 32 | 33 | $612,008 | $12,863,917 |
| 22 | 33 | 34 | $612,910 | $13,476,827 |
| 23 | 34 | 35 | $613,848 | $14,090,675 |
| 24 | 35 | 36 | $614,817 | $14,705,492 |
| 25 | 36 | 37 | $615,821 | $15,321,313 |
| 26 | 37 | 38 | $616,855 | $15,938,168 |
| 27 | 38 | 39 | $617,923 | $16,556,091 |
| 28 | 39 | 40 | $619,023 | $17,175,114 |
| 29 | 40 | 41 | $620,154 | $17,795,268 |
| 30 | 41 | 42 | $621,317 | $18,416,585 |
| 31 | 42 | 43 | $622,512 | $19,039,097 |
| 32 | 43 | 44 | $623,738 | $19,662,835 |
| 33 | 44 | 45 | $624,995 | $20,287,830 |
| 34 | 45 | 46 | $626,282 | $20,914,112 |
| 35 | 46 | 47 | $627,600 | $21,541,712 |
| 36 | 47 | 48 | $628,948 | $22,170,660 |
| 37 | 48 | 49 | $630,327 | $22,800,987 |
| 38 | 49 | 50 | $631,736 | $23,432,723 |
| 39 | 50 | 51 | $633,174 | $24,065,897 |
| 40 | 51 | 52 | $634,641 | $24,700,538 |
| 41 | 52 | 53 | $636,139 | $25,336,677 |
| 42 | 53 | 54 | $637,666 | $25,974,343 |
| 43 | 54 | 55 | $639,220 | $26,613,563 |
| 44 | 55 | 56 | $640,805 | $27,254,368 |
| 45 | 56 | 57 | $642,418 | $27,896,786 |
| 46 | 57 | 58 | $644,060 | $28,540,846 |
| 47* | 58 | 58.6 | $387,438 | $28,928,284 |

Catherine Laag

## SCENARIO #2: Facility Placement, Actual Charges

| Year | AGES: From | To | Annual PV Total | Cumulative Totals |
|---|---|---|---|---|
| 1 | 11.8 | 13 | $752,810 | $     752,810 |
| 2 | 13 | 14 | $624,484 | $  1,377,294 |
| 3 | 14 | 15 | $627,235 | $  2,004,529 |
| 4 | 15 | 16 | $630,003 | $  2,634,532 |
| 5 | 16 | 17 | $632,786 | $  3,267,318 |
| 6 | 17 | 18 | $635,586 | $  3,902,904 |
| 7 | 18 | 19 | $638,404 | $  4,541,308 |
| 8 | 19 | 20 | $641,237 | $  5,182,545 |
| 9 | 20 | 21 | $644,087 | $  5,826,632 |
| 10 | 21 | 22 | $646,955 | $  6,473,587 |
| 11 | 22 | 23 | $466,685 | $  6,940,272 |
| 12 | 23 | 24 | $467,397 | $  7,407,669 |
| 13 | 24 | 25 | $468,135 | $  7,875,804 |
| 14 | 25 | 26 | $468,897 | $  8,344,701 |
| 15 | 26 | 27 | $469,684 | $  8,814,385 |
| 16 | 27 | 28 | $470,496 | $  9,284,881 |
| 17 | 28 | 29 | $471,333 | $  9,756,214 |
| 18 | 29 | 30 | $472,192 | $10,228,406 |
| 19 | 30 | 31 | $473,078 | $10,701,484 |
| 20 | 31 | 32 | $473,986 | $11,175,470 |
| 21 | 32 | 33 | $474,918 | $11,650,388 |
| 22 | 33 | 34 | $475,874 | $12,126,262 |
| 23 | 34 | 35 | $476,854 | $12,603,116 |
| 24 | 35 | 36 | $477,856 | $13,080,972 |
| 25 | 36 | 37 | $478,881 | $13,559,853 |
| 26 | 37 | 38 | $479,931 | $14,039,784 |
| 27 | 38 | 39 | $481,002 | $14,520,786 |
| 28 | 39 | 40 | $482,096 | $15,002,882 |
| 29 | 40 | 41 | $483,213 | $15,486,095 |
| 30 | 41 | 42 | $484,351 | $15,970,446 |
| 31 | 42 | 43 | $485,514 | $16,455,960 |
| 32 | 43 | 44 | $486,696 | $16,942,656 |
| 33 | 44 | 45 | $487,902 | $17,430,558 |
| 34 | 45 | 46 | $489,129 | $17,919,687 |
| 35 | 46 | 47 | $490,378 | $18,410,065 |
| 36 | 47 | 48 | $491,649 | $18,901,714 |
| 37 | 48 | 49 | $492,941 | $19,394,655 |
| 38 | 49 | 50 | $494,254 | $19,888,909 |
| 39 | 50 | 51 | $495,589 | $20,384,498 |
| 40 | 51 | 52 | $496,944 | $20,881,442 |
| 41 | 52 | 53 | $498,321 | $21,379,764 |
| 42 | 53 | 54 | $499,719 | $21,879,483 |
| 43 | 54 | 55 | $501,137 | $22,380,620 |
| 44 | 55 | 56 | $502,577 | $22,883,197 |
| 45 | 56 | 57 | $504,037 | $23,387,234 |
| 46 | 57 | 58 | $505,517 | $23,892,751 |
| 47* | 58 | 58.6 | $304,210 | $24,196,961 |

Catherine Laag

## SCENARIO #3: Facility Placement, Contracted Rate

| Year | AGES: From | To | Annual PV Total | Cumulative Totals |
|---|---|---|---|---|
| 1 | 11.8 | 13 | $565,784 | $ 565,784 |
| 2 | 13 | 14 | $467,884 | $ 1,033,668 |
| 3 | 14 | 15 | $469,887 | $ 1,503,555 |
| 4 | 15 | 16 | $471,901 | $ 1,975,456 |
| 5 | 16 | 17 | $473,930 | $ 2,449,386 |
| 6 | 17 | 18 | $475,971 | $ 2,925,357 |
| 7 | 18 | 19 | $478,025 | $ 3,403,382 |
| 8 | 19 | 20 | $480,092 | $ 3,883,474 |
| 9 | 20 | 21 | $482,172 | $ 4,365,646 |
| 10 | 21 | 22 | $484,264 | $ 4,849,910 |
| 11 | 22 | 23 | $466,686 | $ 5,316,596 |
| 12 | 23 | 24 | $467,397 | $ 5,783,993 |
| 13 | 24 | 25 | $468,135 | $ 6,252,128 |
| 14 | 25 | 26 | $468,897 | $ 6,721,025 |
| 15 | 26 | 27 | $469,684 | $ 7,190,709 |
| 16 | 27 | 28 | $470,496 | $ 7,661,205 |
| 17 | 28 | 29 | $471,332 | $ 8,132,537 |
| 18 | 29 | 30 | $472,193 | $ 8,604,730 |
| 19 | 30 | 31 | $473,077 | $ 9,077,807 |
| 20 | 31 | 32 | $473,986 | $ 9,551,793 |
| 21 | 32 | 33 | $474,919 | $10,026,712 |
| 22 | 33 | 34 | $475,874 | $10,502,586 |
| 23 | 34 | 35 | $476,853 | $10,979,439 |
| 24 | 35 | 36 | $477,856 | $11,457,295 |
| 25 | 36 | 37 | $478,882 | $11,936,177 |
| 26 | 37 | 38 | $479,931 | $12,416,108 |
| 27 | 38 | 39 | $481,001 | $12,897,109 |
| 28 | 39 | 40 | $482,097 | $13,379,206 |
| 29 | 40 | 41 | $483,212 | $13,862,418 |
| 30 | 41 | 42 | $484,352 | $14,346,770 |
| 31 | 42 | 43 | $485,513 | $14,832,283 |
| 32 | 43 | 44 | $486,697 | $15,318,980 |
| 33 | 44 | 45 | $487,902 | $15,806,882 |
| 34 | 45 | 46 | $489,129 | $16,296,011 |
| 35 | 46 | 47 | $490,378 | $16,786,389 |
| 36 | 47 | 48 | $491,649 | $17,278,038 |
| 37 | 48 | 49 | $492,940 | $17,770,978 |
| 38 | 49 | 50 | $494,255 | $18,265,233 |
| 39 | 50 | 51 | $495,588 | $18,760,821 |
| 40 | 51 | 52 | $496,945 | $19,257,766 |
| 41 | 52 | 53 | $498,321 | $19,756,087 |
| 42 | 53 | 54 | $499,719 | $20,255,806 |
| 43 | 54 | 55 | $501,138 | $20,756,944 |
| 44 | 55 | 56 | $502,577 | $21,259,521 |
| 45 | 56 | 57 | $504,036 | $21,763,557 |
| 46 | 57 | 58 | $505,517 | $22,269,074 |
| 47* | 58 | 58.6 | $304,211 | $22,573,285 |

# EXHIBIT C

Case 1:04-cv-01306-GMS   Document 72-2   Filed 12/08/2005   Page 17 of 19
MICHAEL D. KATZ, M.D.

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CATHERINE B. LAAG, a minor, by her Parent and Natural Guardian, JOHN LAAG and JOHN LAAG, Individually and In his own right, | : TRANSCRIPT OF<br>: PROCEEDINGS |
| Plaintiff, | : |
| v. | : |
| EDWARD J. CULLEN, JR., D.O., JAMES HERTZOG, M.D., and NEMOURS FOUNDATION d/b/a A.I. DUPONT HOSPITAL FOR CHILDREN, a Delaware Corporation, | : |
| Defendants. | : |

---------------
Tuesday, October 25th, 2005
---------------

Pretrial examination of MICHAEL D. KATZ, M.D., held at the offices of MICHAEL D. KATZ, M.D., 77 Prospect Avenue, Suite 1K, Hackensack, New Jersey, on the above before DONNA E. KELLS, a Certified Shorthand Reporter and Notary Public of the State of New Jersey.

---------------

CORBETT & ASSOCIATES
1400 North French Street
P.O. Box 25085
Wilmington, Delaware 19899
302-571-0510

1  quite good care and then my own personal
2  experience with people in persistent vegetative
3  state.
4      Q.   You added how many years?
5      A.   Well, she was 11, is that correct,
6  when the injury occurred?  Was she 10 or 11?
7      Q.   One or the other.
8           MR. HUNN:  She was 10.
9      A.   So 10 plus 12.2, that puts her in
10 lower 20's.  I felt given the latest piece of
11 information that I have which is Strauss,
12 Shavelle, Ashwal's article, plus what I physically
13 saw, I thought that that was an underestimate.
14          So that's why my approximation was
15 late 20's, early 30's.  That's how I came to that
16 conclusion.
17     Q.   So that if we go to the early 30's, is
18 that what you are saying?
19     A.   Late 20's, early 30's.
20     Q.   What are you saying, 28 to 32?
21     A.   Yes, that's what I'm saying.
22     Q.   So if you go to 32 you almost doubled
23 her life expectancy.
24          MR. HUNN:  Objection to form.
25     A.   Run that question by me

1   that again.
2       Q.   Sure.   According to the Ashwal
3   article, the life expectancy four years after
4   onset is 12.2 years, correct?
5       A.   Okay.
6       Q.   If you go to 32 you've added 10 years,
7   which is almost double her life expectancy.   Is
8   that fair to say?
9       A.   You have to ask me a question.   It is
10  too many numbers for me.   I'm sorry.
11      Q.   You told me you took the Ashwal number
12  from table three of life expectancy four years
13  after onset of incident.
14      A.   12.2.
15      Q.   12.2?
16      A.   Right.
17      Q.   And am I correct that you are saying
18  that her life expectancy is really from late 20's
19  to early 30's?
20      A.   Right.
21      Q.   So I said something around 32 years of
22  age, is that about what you are saying.
23      A.   That's my best guess.
24      Q.   Now, is there anything -- do you know
25  what a secular trend is as referred to by Ashwal