## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CATHERINE B. LAAG, a minor, by her Parent and Natural Guardian, JOHN LAAG, And JOHN LAAG Individually and in his Own right, plaintiffs | : : : : : | CASE NO. **CA 04-1306-GMS** |
| vs. | : : | |
| EDWARD J. CULLEN, JR., D.O., JAMES HERTZOG, M.D. and NEMOURS FOUNDATION d/b/a A. I. DuPONT HOSPITAL FOR CHILDREN, A Delaware Corporation | : : : : | |

### PLAINTIFF'S TRIAL BRIEF

**BERKOWITZ, SCHAGRIN, & COOPER, P.A.**

Martin A. Schagrin_____
MARTIN A. SCHAGRIN
1218 Market Street
P.O. Box 1632
Wilmington, Delaware 19899
(302) 656-3155

**KOLSBY, GORDON, ROBIN, SHORE & BEZAR**

Robert N. Hunn_____
ROBERT N. HUNN
F.PHILIP ROBIN
Kolsby, Gordon, Robin, Shore & Bezar
Suite 2250, 1650 Market Street
Philadelphia, PA 19103
(215) 851-9700

**Attorneys for Plaintiff Catherine Laag, a minor
And John Laag, her parent and natural guardian**

I.      **NATURE OF THE CASE**

This is a medical malpractice action brought before this court pursuant to 28 U.S.C. §1332.

The plaintiffs are 12 year old Catherine Laag and her father and natural guardian, John Laag. At the age of 10, Catherine suffered severe brain damage as a result of the defendants' negligence and is currently in a persistent vegetative state. She resides in the Voorhees Pediatric Facility located in Voorhees, New Jersey.

The defendants are Edward J. Cullen, Jr., D.O., a pediatric critical care physician, and his employer, the Nemours Foundation.

II.      **FACTS WHICH THE EVIDENCE WILL ESTABLISH**

On August 27, 2003, 10 year old Catherine Laag was transferred from the Virtua West Jersey Hospital in Voorhees, New Jersey to A.I. DuPont Hospital for Children ("DuPont Hospital") in Wilmington, Delaware with pneumonia. She was admitted to the Pediatric Intensive Care Unit. Over the next two weeks, defendant Cullen was the critical care specialist who rounded most frequently on Catherine. Although Catherine needed mechanical ventilation for a period of time, she was expected to make a full recovery from her pneumonia.

Catherine underwent the process of weaning from the ventilator for the purpose of extubation. On the night of September 8, 2003, a nurse informed John Laag that there was a rumor that Catherine would be extubated the following morning. Mr. Laag and the nurse discussed that the rumor was likely false as Catherine was still too sick to be extubated. Mr. Laag informed the nurse that if any physician was serious about extubating his daughter, he wanted to be notified and be present for the extubation.

Dr. Cullen proceeded with the extubation on the morning of September 9, 2003. However the factors that a physician should customarily consider when making a decision to

extubate indicated that Catherine was too sick to have her tracheal tube removed. For example, her September 9th chest x-ray showed unresolved pneumonia and she required an oxygen concentration ranging between 50% to 60%. Without mechanical ventilation, Catherine would not be able to breathe adequately.

Other factors also indicated that Catherine would not be able to breathe if extubated. That morning Catherine's mean arterial pressure (MAP) was 10 which indicates a significant risk that she would not be able to breathe without mechanical ventilation. Her Peak Inspiratory Pressure was between 30-31 and her positive end expiratory pressure was 6. Both were indications that Catherine would not be able to adequately breathe if extubated. She had thick white secretions coming from her mouth that required suctioning and she still required the ventilation machine to take a significant number of breaths for her.

In the time period leading up to the extubation, Catherine had bouts of agitation. Airway swelling can occur in an agitated patient when the endotracheal tube is withdrawn. A physician can test to determine whether there is a risk of airway swelling by performing what is called a "leak test." If air can be bled from a cuff on the endotracheal tube, that indicates that there is space between the sides of the trachea and the tube and the risk of swelling is minimal. Dr. Cullen, however, could not be bothered to perform that simply test.

A physician can assess whether a patient is ready to be extubated by performing a trial of C-PAP. A trial of C-PAP involves removing the patient from the ventilator for a significant period of time while the nursing staff monitors the patient's respiratory efforts and oxygenation. The patient's work of breathing is recorded in the chart allowing the physician, at the end of the C-PAP trial, to assess the patient's ability to breath over a period of time and thus their readiness for extubation. No such nursing notes exist.

It is also important for a physician to know, prior to an extubation, the level of oxygen being carried in the patient's blood system. This is done by taking arterial blood gases. Dr. Cullen, however, never bothered to check Catherine's arterial blood gases prior to the extubation.

Dr. Cullen first examined Catherine at 8:59 a.m. on the morning of September 9, 2003. At that time, Catherine's nurse, Cheryl Martinenza first warned Dr. Cullen that Catherine was not ready to be extubated. She told him that the extubation should be put off for at least a day due to Catherine's heavy secretions that required suctioning. Dr. Cullen ignored her warnings regarding the severity of the secretions. He did, however, acknowledge, by his words and his conduct, that Catherine would likely not be able to breathe, if extubated. He decided to place her immediately on Bi-PAP even though she had failed Bi-PAP earlier in her hospitalization. At no time did he contact Catherine's father and inform him that he was performing a risky extubation on his daughter.

Dr. Cullen left Catherine's room and returned approximately 3 minutes before the extubation. For a second time, nurse Martinenza warned Dr. Cullen about the severity of Catherine's secretions. Again, Dr. Cullen ignored her concerns.

As could be expected, when Catherine was extubated, she could not oxygenate and quickly went into respiratory distress. Within 10 minutes of the extubation, Dr. Cullen decided to re-intubate Catherine. The first attempt was made by first year Fellow, Dr. Carol Boyd. Dr. Boyd had only been a Fellow for approximately 60 days. Although she could visualize the vocal cords (which suggests that any airway swelling was not severe) she was unable to intubate Catherine. Dr. Cullen tried next but could not intubate because of Catherine's anatomy.[1]

The specialist with the most expertise in the upper air way is the Ear, Nose and Throat physician ("ENT"). Dr. Cullen, however, did not call for an ENT. Instead, he called for an anestiologist who also was unable to insert the tube.

By 12:05 pm, Catherine was in full arrest. Dr. Cullen failed to sufficiently oxygenate her even by bagging oxygen. It was not until over 30 minutes passed since Catherine went into respiratory distress that Dr. Cullen called for an ENT. The ENT arrived and within 5 minutes

---

[1] Children with Down Syndrome customarily have anatomical features which include large tongues and short necks.

4

observed that Catherine was not properly positioned. He re-positioned Catherine's head and inserted the endotracheal tube.

Tragically, Catherine was deprived oxygen for over 30 minutes and suffered massive brain damage. She remains in a persistent vegetative state.

### III.     PLAINTIFF'S THEORY OF LIABILITY

Dr. Cullen breached all standards of good and acceptable medical practice by taking an unacceptable risk of catastrophic harm with a 10 year old child. His conduct that day reflects the actions of a burned-out physician who was simply going through the motions of being a physician without concern for the risks of his conduct.

There were clear and undisputable signs that Catherine was not ready to be extubated. Dr. Cullen ignored those signs. Dr. Cullen did not perform a proper C-PAP trial to assess whether Catherine was ready to be extubated. Dr. Cullen failed to properly assess his patient's upper airway to determine whether she was at risk for airway swelling upon extubation. Dr. Cullen did not inform Catherine's father of the extubation in advance. Dr. Cullen did not heed the warnings of the unit nurse.

Most disturbing is the fact that Dr. Cullen clearly knew that Catherine was not ready to be extubated. He also knew that it might be difficult to re-intubating her in light of the fact that it took two attempts to initially intubate her on August 29, 2003. Instead of stopping the extubation, he decided to put her on Bi-PAP even though she failed a trial of Bi-PAP earlier in her hospitalization. Moreover, by using Bi-PAP on a patient with heavy secretions that needed to be suctioned, the mask would have to be removed to suction the secretions. With the mask removed, Catherine could not receive the oxygen concentration she required. Dr. Cullen placed this child in a no-win situation guaranteeing that she would suffer harm from the risk he was exposing her to.

**IV.   DAMAGES**

Plaintiff seeks the following damages at trial:

1. Pain and suffering from the time that Catherine was taken off sedatives on September 9, 2003 to the time that she went into cardio respiratory arrest;

2. Permanent impairment;

3. Past medical expenses; and

4. Future medical expenses

**V.   DIRECTED VERDICT MOTIONS**

Plaintiff does not anticipate any motions for a directed verdict on any trial issues.

**BERKOWITZ, SCHAGRIN, & COOPER, P.A.**

Martin A. Schagrin_____
MARTIN A. SCHAGRIN
1218 Market Street
P.O. Box 1632
Wilmington, Delaware  19899
(302) 656-3155

**KOLSBY, GORDON, ROBIN, SHORE & BEZAR**

Robert N. Hunn_____
ROBERT N. HUNN
Kolsby, Gordon, Robin, Shore & Bezar
Suite 2250, 1650 Market Street
Philadelphia, PA  19103
(215) 851-9700

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date, December 9, 2005, he caused to be served a copy of the forgoing Trial Brief on counsel of record for the defense, via electronic filing and First Class Mail:

<u>Michael P. Kelly, Esquire /s/</u>
MICHAEL P. KELLY, ESQUIRE
McCarter & English
919 N. Market Street
Suite 1800
P.O. Box 111
Wilmington, DE  19899
(302) 984-6333

**BERKOWITZ, SCHAGRIN, & COOPER, P.A.**

<u>Martin A. Schagrin_____</u>
MARTIN A. SCHAGRIN
1218 Market Street
P.O. Box 1632
Wilmington, Delaware  19899
(302) 656-3155

**KOLSBY, GORDON, ROBIN, SHORE & BEZAR**

<u>Robert N. Hunn_____</u>
ROBERT N. HUNN
Kolsby, Gordon, Robin, Shore & Bezar
Suite 2250, 1650 Market Street
Philadelphia, PA  19103
(215) 851-9700