# EXHIBIT A



Not Reported in A.2d
Not Reported in A.2d, 1999 WL 126997 (Del.Ch.)
**(Cite as: 1999 WL 126997 (Del.Ch.))**

Page 1

▶
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
William A. LAW, III, Reed A. Law, Annette L. Martin and Eric C. Law,
Plaintiffs,
v.
Kathryn J. LAW and Gary W. Law, Trustees of the Virginia M. Law Trust,
Defendants.
**No. CIV. A. 14352.**

Feb. 24, 1999.

P. Clarkston Collins, Jr., Norris P. Wright and Michael A. Weidinger of Morris, James, Hitchens & Williams, Wilmington, Delaware. Attorneys for Plaintiffs.

David N. Rutt of Moore & Rutt, Georgetown, Delaware. Attorney for Defendants.

### MEMORANDUM OPINION

STEELE, V.C.

*1 William A. Law, III, Reed A. Law, Annette L. Martin, and Eric C. Law (the "Remaindermen") brought this action against Kathryn J. Law and Gary W. Law (the "Trustees"). The Remaindermen asserted that the Trustees breached fiduciary duties owed the Remaindermen while administering the Virginia M. Law Trust (the "Trust"). On September 30, 1997, I granted partial summary judgment on these claims, finding as a matter of law that the Trustees breached their duties of loyalty and care to the Remaindermen by investing the Trust's funds with the singular purpose of providing tax-free income to William Law during his life.

The remaining issues in contention are:

(a) The measure of and amount of any damages recoverable by the Remaindermen; and,

(b) Attorneys fees and costs.

A. Measure and Amount of Damages

After hearing the parties' expert witnesses and legal arguments, I find the Remaindermen should recover for their pecuniary loss caused by the Trustees' willful failure to balance the needs and interests of the Remaindermen with those of William Law in investing the Trust's assets. I find persuasive the testimony of the Remaindermen's expert, and rely on his forecasts to calculate an appropriate award. While the Trustees have argued elements of mitigation which could effect both the scope of damages as well as the amount of any monetary award, neither the law nor the facts support those defenses. Plaintiffs' counsel shall prepare a form of order which reflects the amount of damages in light of my rulings.

B. Attorneys' Fees and Costs

I find that the Trustees compounded their breaches of fiduciary duty by a self-interested distribution of their two-thirds of the Trust to themselves without heeding the Remaindermen's legitimate concern that funds remain in the trust available to pay the Remaindermen and the Remaindermen's attorneys, without filing a statutorily mandated accounting of trust assets, without petitioning for instructions from the Court, and, incomprehensibly, without concern for their fiduciary obligation to act in the best interest of all trust beneficiaries. Their intentional, unconscionable and egregious conduct demands an award of attorneys' fees and legal costs.

### I. BACKGROUND
In setting forth my reasons for granting partial summary judgment, I summarized the factual background as follows:
> Virginia and William Law had three children, Gary, Kathryn and Ken. Ken died in December, 1980 leaving his widow, Ethel Webb, and four children, William A. Law, III, Reed A. Law, Annette L. Martin, and Eric C. Law. Virginia Law died in November, 1982. Her will directed that, if her assets were sufficient, a portion of her assets were to be placed in trust with her husband William receiving the income from that trust during his lifetime, and with their surviving children, Gary and Kathryn, serving as trustees. The remainder of her assets [passed directly] to William who served as the executor of her estate.
> *2 Virginia's will also provided that, upon

William's death, Gary and Kathryn would each receive one-third of any remaining trust corpus. The last one-third was to be placed again in trust, with Gary and Kathryn as trustees, for the benefit of Ken's four children until the youngest reached the age of twenty-five.

Ken's four children, William, Reed, Annette and Eric (the "Law Remaindermen") initiated this action against Gary and Kathryn (the "Law Trustees") alleging that they failed to manage the first trust established pursuant to the terms of Virginia's will. The complaint alleges that the Law Trustees failed to ensure that the trust was properly funded, breached their fiduciary duty of loyalty by intentionally placing the interests of William over the interests of the Law Remaindermen, breached their fiduciary duty of care by failing properly to invest the trust assets, and failed to file statutorily required accountings. [FN1]

> FN1. *Law v. Law,* Del. Ch., C.A. No. 14352, mem. op. at 2-3, Steele, V.C. (Oct. 2, 1997).

In my Summary Judgment Opinion, I held that:
1. Unambiguous terms of the will provided that administrative expenses were to be deducted from the entire estate before the trust was funded with the intended corpus of $225,000.
2. The Trustees breached their duty of loyalty to the Remaindermen by making no effort to divine, much less account for, their needs when investing the Trust's assets during the life of the living beneficiary, William Law.
3. The Trustees' complete failure to factor the needs of the Remaindermen into their investment strategy breached their duties of loyalty and care to the Remaindermen.
4. The Trustees admitted that they failed to file their statutory accounting.
5. The Trustees' defense of laches had no merit in light of their failure to file a statutory accounting that would have put the Remaindermen on notice that the Trust's assets were dwindling and in light of the fact that the Remaindermen filed suit within a year of William Law's death. [FN2]

> FN2. *Id.* at 5-12.

II. PARTIES' CONTENTIONS & RULINGS OF LAW

The parties agree that I must award damages in this case to compensate the Remaindermen for the Trustees' unlawful diminishment of the Trust's assets. Money damages should be calculated to reflect the same financial benefits that the Remaindermen would have enjoyed absent the Trustees' breach of fiduciary duty. The hearing on damages gave the parties the opportunity to present evidence to establish how much money would have remained in the Trust at the time of William Law's death if the Trustees had managed the Trust prudently and in good faith. The following describes evidence actually produced at trial, the parties' post-trial legal argument and sets forth my rulings of law.

1. The experts

Both sides presented experts who testified on how a prudent trustee would have invested the Trust funds. Although differing in application, both experts predicted growth in the Trust principal achieved through a mixed equity/debt portfolio. Both assumed a no-growth debt portion and a growing, somewhat more aggressive equity portion, the dividends from which would be paid to William Law during his life. Neither expert attempted to rebalance the portfolio in their respective projections, but allowed the equity portion to grow in proportion to the debt portion.

*3 The Remaindermen presented an executive in Wilmington Trust's trust department, P.M. Snyder ("Snyder"). Snyder monitors eighteen portfolio managers in a trust department managing approximately $15 billion in assets. Snyder showed a keen understanding of the prudent investor standard. He had experience in balancing the competing interests of different classes of beneficiaries in light of that standard. Snyder's real world experience materially enhanced his credibility at trial.

Snyder presented a series of calculations assuming that the Trustees invested either 50% or 60% of their funds in an S & P 500 index fund and paid the dividends to the life beneficiary, William Law. He testified that investment in an index fund would require only passive oversight, entitling the fund manager to charge a reasonable management fee of 20 to 25 basis points for its efforts, but that more actively managed equity investments might incur a management fee of 30 to 100 points.

TABLE I

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
Not Reported in A.2d, 1999 WL 126997 (Del.Ch.)  
**(Cite as: 1999 WL 126997 (Del.Ch.))**

Page 3

```
                         Snyder Scenarios

scenario   equity/debt split   ending date   Remaindermen's share
----------------------------------------------------------------
A          50/50               3/14/95       $149,928.75


B          50/50               2/28/98       $276,855.00

C          60/40               3/14/95       $164,914.50

D          60/40               2/28/98       $317,226.00
----------------------------------------------------------------
```

Snyder opined that a 50/50 equity to debt split represented the most reasonable scenario in light of the trustees' need to balance the interests of William Law and the Remaindermen. He added that a 60/40 split in favor of the remainder interest was also reasonable in light of William Law's personal wealth and suggested that even a 70% investment in equities could result in a legally acceptable ratio.

The Trustees presented Dr. Andrew Fields, MBA, MA, PhD ("Fields") as their expert. Fields chairs the Department of Finance, University of Delaware. Fields possesses impeccable credentials. He has published several articles and done research in the area of portfolio selection and portfolio performance. He presented a larger array of scenarios produced by modifying key variables.

Fields chose the S & P High Grade Stock Index, which he considered superior to the S & P 500 because it contained blue-chip companies of the kind that would meet a trustee's investment criteria. In his deposition, Fields criticized the Dow, which is similarly weighted in favor of blue chips, stating that the Dow was too narrow an index, because it contained only 30 companies' stock. In that same deposition, Fields testified he believed his index contained 200 to 250 stocks. During cross-examination at trial, Fields acknowledged he had erred in his view because in fact the S & P High Grade Stock Index he favored contained only 25 stocks.

```
                             TABLE II
                          Fields Scenarios

          Start Value   Period        Start Equity %   Estimated Loss of Value
          -----------   ------        --------------   -----------------------

Table 1   204,618.00    8/93--6/94    50%              27,846.84
Table 2   204,618.00    8/93--6/94    30%              16,708.84
Table 3   204,618.00    8/93--6/94    15%               2,354.05

Table 4   225,000.00    8/93--6/94    50%              30,620.66

Table 5   225,000.00    8/93--6/94    30%              18,372.40
Table 6   225,000.00    8/93--6/94    15%               9,186.20

Table 7   204,618.00    8/93--3/95    50%              34,096.48
Table 8   204,618.00    8/93--3/95    30%              20,457.89
Table 9   204,618.00    8/93--3/95    15%              10,228.94
```

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 4
Not Reported in A.2d, 1999 WL 126997 (Del.Ch.)
**(Cite as: 1999 WL 126997 (Del.Ch.))**

```
Table 10    225,000.00    8/93--3/95     50%         37,492.83

Table 11    225,000.00    8/93--3/95     30%         22,495.70
Table 12    225,000.00    8/93--3/95     15%         11,247.85

Table 13    204,618.00    6/86--6/94     50%          9,097.69
Table 14    204,618.00    6/86--6/94     30%          5,458.61
Table 15    204,618.00    6/86--6/94     15%          2,729.31

Table 16    225,000.00    6/86--6/94     50%         10,003.91
Table 17    225,000.00    6/86--6/94     30%          6,002.39
Table 18    225,000.00    6/86--6/94     15%          3,001.17

Table 19    204,618.00    6/86--6/94     50%         13,455.88

Table 20    204,618.00    6/86--6/94     30%          8,073.53
Table 21    204,618.00    6/86--6/94     15%          4,036.76

Table 22    225,000.00    6/86--3/95     50%         14,796.22
Table 23    225,000.00    6/86--3/95     30%          8,877.73
Table 24    225,000.00    6/86--3/95     15%          4,438.87

Table 25    204,618.00    8/83--12/97    50%         75,586.01
Table 26    204,618.00    8/83--12/97    30%         45,351.60
Table 27    204,618.00    8/83--12/97    15%         22,675.80

Table 28    225,000.00    8/83--12/97    50%         83,115.13
Table 29    225,000.00    8/83--12/97    30%         49,869.08
Table 30    225,000.00    8/83--12/97   115%         24,934.54

Table 31    204,618.00    6/86--12/97    50%         42,388.58
Table 32    204,618.00    6/86--12/97    30%         25,433.15
Table 33    204,618.00    6/86--12/97    15%         12,715.57

Table 34    225,000.00    6/86--12/97    50%         46,610.91
Table 35    225,000.00    6/86--12/97    30%         27,966.54

Table 36    225,000.00    6/86--12/97    15%         13,983.27
```

*4 Fields utilized equity to debt mixes ranging from 15/85 to 50/50 and produced damages in the range of $2,729.31 to $83,115.13, all the while contending that even a 100% debt portfolio would be appropriate. Fields included an annual 2.5% deduction from the Trust principal for management fees.

2. Trust management experience

Fields is an extremely intelligent and prepared witness, but his background is academic research, not trust management. Some of his investment scenarios were simply not helpful to resolving the dispute, using too little equity in the portfolio mix of investments.

I found Snyder's background much more likely to instill confidence that his opinion relates to the crux of the issue at hand: How a prudent trustee would invest the Trust funds so as to balance the needs of William Law and the Remaindermen. Snyder had experience in devising a portfolio that mixed equities and debt instruments to meet conflicting income and growth goals with appropriate risk

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

analysis. He was experienced in structuring a portfolio designed to meet conflicting goals *in light of* the prudent investor standard. Snyder's sensible allocation of funds, I conclude, reflected his acumen in this area. Although Fields is a credible, qualified expert, Snyder's work experience made him the more persuasive expert.

3. The proper equity/debt mix

Fields' scenarios range from an equity/debt split of 15/85 to 50/50. Articles used by Fields to devise his ratios indicate that investment banks, with some sensitivity to market performance, tend to recommend a split of somewhere around 50/50. Snyder used a 50/50 and 60/40 split. Each expert considered a 50/50 split to be the outermost acceptable ratio. Although neither preferred this number, both accepted it. Furthermore, the 50/50 split is a reasonable asset deployment in light of the settlor's wishes. As I noted in my Summary Judgment Opinion, Virginia Law expressed her testamentary intent as follows:

> The portion of the trust set aside at William's death for the benefit of the Law Remaindermen was to "insure the comfortable support, maintenance, education, including college education, general welfare and care [of the Law Remaindermen and] any payments to be made [to the Law Remaindermen] shall be made according to the needs of my grandchildren, and not necessarily equally." [FN3]
>
>> FN3. October 2, 1997 Mem. Op., *supra* note 1, at 6 (citing Last Will and Testament of Virginia M. Law, ¶ FIFTH(C)(2)).

A 50/50 split in equity and debt would deploy the Trust assets in a fashion reasonably likely to have provided a comfortable income for an already well-off William Law while assuring growth in principal sufficient to provide for Virginia's express concern for the interests of the Remaindermen. Consequently, that ratio should be the basis for determining damages.

4. Which index was most appropriate?

Fields' apparent mistake as to the number of shares held in the S & P High Grade Stock Index undercuts my confidence in the merit of selecting this relatively unknown index. It is possible, of course, that a trustee who is using debt to provide stable income could devise a prudent portfolio using either Fields' S & P High Grade Stock Index or the S & P 500 or, for that matter, the Dow, to create a growth component. But at deposition, Fields justified his selection of the S & P High Grade Stock Index over the Dow because he believed it reflected a wider range of blue chip stocks. On cross-examination at trial, he admitted that the index he chose actually contained fewer stocks than the Dow--25 as opposed to 30. This error undermined my confidence in his judgment.

*5 I note, moreover, that the S & P 500 outperformed the S & P High Grade Stock Index during the period in question. This is not surprising because the latter favors blue chip companies whose steady earnings are smaller than some of the more volatile companies included in the S & P 500. In light of this, I find Fields' use of the stable, but relatively low growth S & P High Grade Stock Index *in conjunction with* a low percentage of Trust assets allocated to equity investments would unreasonably and unfairly suppress equity growth. Snyder's allocation of 50% to 60% of initial assets to a fund tracking the S & P 500 preserves sufficient assets for low-risk debt investments while allocating enough towards equity investments with professional management and minimum risk in a manner that could conservatively address the Remaindermen's needs. I believed the reasonably prudent trustee carefully fulfilling his duties of care and loyalty would follow Snyder's prudent, balanced use of a well-known index. It will be the model for calculating damages.

5. Management Fee & Transactions Costs

Both experts allowed that some type of fee would have been assessed against the funds invested in equity, but differed as to what a reasonable amount might be. Snyder did not factor any costs into his scenarios, but admitted that a fee between 20 to 100 points, deducted from income and principal, would be reasonable, depending on the type of investment. He testified that the Trustees could have purchased an S & P 500 index fund that mimicked the index's performance, noting that many of these "tracking" funds charged minimal administrative fees. He testified a fee of 20 to 25 basis points for this type of tracking fund investment would be reasonable.

Fields challenged Snyder's testimony, stating that Snyder's "reasonable fees" were too low. Fields testified that index funds contained hidden costs that effectively raise the fees to 80 to 100 basis points. He also noted that index funds were not a popular investment vehicle in 1983, when the Trust was created. Fields deducted 2.5% in fees from trust principal each year. The Remaindermen disputed the size of Fields' deduction and his conclusion to deduct from principal alone.

I note that both experts used an index to measure damages, so Fields' unrebutted testimony as to the lack of popularity of index funds in 1983 is relevant only to the issue of management fees, not to the agreed upon method of measuring damages--tracking an index. Snyder

admitted that an investment vehicle more actively managed than a passive tracking fund would incur fees of 30 to 100 basis points. Again, in unrebutted testimony, Fields noted that a passive tracking funds' fees, when factoring in hidden costs, total 80 to 100 basis points. Although the experts were not in agreement as to the nature of the equity instrument to be used, they both stated that costs of up to 100 basis points could be reasonable. Fields testified that a range of 80 to 100 bonus points reflected the true costs built into a passive tracking fund and Snyder testified that a range of 30 to 100 was reasonable for an actively managed investment. Therefore, I conclude that a fee of 80 to 100 basis points is substantiated by both expert's testimony. This conclusion seems fair, on the sparse record before me, because I can only assume that Fields' prediction of hidden costs approximates the minimum costs of an actively managed investment. If Field's hidden costs fall within the upper range of Snyder's assessment of reasonable fees for an actively managed investment, the overlap constitutes a common ground within which I can comfortably confine my ruling.

*6 There is no persuasive factual evidence that 80 points is more reasonable than 100 points or that deducting the fees half from income and half from equity principal is more reasonable than deducting the fees only from principal. To resolve these two material differences in the experts' testimony, I rely on my overall assessment of credibility. Because Snyder demonstrated a more concrete knowledge of trust investment issues, I adopt the lower management fee of 80 basis points and the half principal, half income deduction advocated by him as the more reasonable and fair result.

6. Starting Date

The obvious starting date for calculating damages would appear to be August 31, 1983, but the Trustees assert that my earlier Summary Judgment Opinion should be effective only from July 3, 1986. That was the day that Delaware adopted 12 Del. C. § 3302, which embodies the portfolio standard for prudent investing. Before that date, the trustee of a Delaware trust could be shielded from liability for breach of fiduciary duty by investing in so-called "legals"--instruments approved by statute. The Trustees here allege, and the Remaindermen dispute, that the Trust contained only legals. Thus, the Trustees conclude that they are shielded from liability up until July 3, 1983.

> Their argument misapprehends the nature of the "legals" shield. The shield protected a trustee from liability for an instrument that the trustee selected in good faith if the instrument failed to perform adequately. The statute designed a shield to protect the trustee from liability should a specific investment within a protected category fail. [FN4] The shield was emphatically not designed to protect a trustee who ignored his duty to Remaindermen and who openly favored the interests of a life beneficiary. One might say the statute created safe harbors for certain classes of investments usually considered safe that might inexplicably go wrong. It emphatically did not excuse trustees from honoring the duty of loyalty owed to all to whom they acted as a fiduciary. No more compelling fact situation could illustrate this distinction than here where the Remaindermen's interests were tantamount to abandoned, the life beneficiary's tax free income source and ultimate estate maximized with the trustees potentially sharing the life beneficiary's estate. The Trustees were, in fact, beneficiaries of William Law's estate--an estate that they had--through their breach of loyalty to the Remaindermen-- purposefully enhanced. [FN5] Here, the Trustees willfully ignored the needs of the Remaindermen in making their investment decisions. They did so in a scenario leaving the clear perception they acted in their own interests or out of enmity to the Remaindermen. This breach of the fiduciary duty of loyalty arose not from the nature of the investments made, but from the Trustee's failure to address or even ascertain the Remaindermen's needs. Therefore, the Trustees could not discharge their fiduciary duties of care and loyalty simply by investing entirely in legals and are, therefore, not shielded by the statute.

FN4. The shield afforded an investment in legals was articulated in 1931:
> A trustee is not a guarantor of the investments he makes. But he must observe a certain degree of care in the investment of the funds committed to his management ....
>
> * * *
>
> [T]rustees are not ... absolutely required to invest the trust funds in the so-called "legals" enumerated in the statute. The effect of such permissive statutes is "that if trustees keep within the categories of investment named in the statute, they are afforded a protection against surcharge due to loss which, had they stepped outside the authorized classes of investment, they might well be made to bear."

*In re Cook's Trust Estate*, Del. Ch., 171 A. 730, 731 (1934).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 126997 (Del.Ch.)
**(Cite as: 1999 WL 126997 (Del.Ch.))**

Page 7

> FN5. Will of William A. Law (Nov. 7, 1991) (filed June 20, 1994 with Sussex County Register of Wills, Book 256, page 00206).

### 7. Ending date

*7 Resolution of this issue requires consideration of some additional facts regarding the parties' course of dealing while disputing this claim. William Law died on June 14, 1994. On November 29, 1994, the Trustees' lawyer, David W. Baker, made an informal accounting of the Trust funds and proposed distributing the funds to the Remaindermen (and to the Trustees as co-remaindermen) in return for a release of all claims against the Trustees. On March 14, 1995, Baker sent each of the four Remaindermen a check for $17,988.22 with a one-page accounting without mentioning the release. [FN6] I note that no statutory accounting of the Trust had been provided to the Plaintiffs nor filed as required by law and that the Remaindermen had no official information on how the Trust had been managed. The Remaindermen did not accept the checks. On February 5, 1996, Baker wrote the Remaindermen that payment had been stopped on the checks, but that "the trustee is willing to make this payment to you without a release of any rights which you believe you may have." [FN7] On February 12, 1996, counsel for Remaindermen agreed in principal to Baker's February 5th letter and asked Baker to proceed with the disbursement. On March 1, 1996, Baker replied that because the IRS sought to include the Trust in William Law's estate, the Trust funds could not be distributed. He stated that, while they negotiated with the IRS, the Trustees would invest the Trust funds in a money market account. Baker added that the Trustees could put the funds in stocks and bonds, but would do so only if the beneficiaries would assume all risk of loss from the investments.

> FN6. To be annoyingly accurate, Remaindermen William A. Law, III was offered a penny less.

> FN7. David W. Baker, letter to William A. Law, III (Feb. 5, 1996).

The Remaindermen rejected the latter proposal, concluding "it is still the responsibility of the Trustees to administer the trust fund." [FN8] On June 24, 1996, after the Trustees resolved the IRS matter favorably, the Trustees disbursed 2/3 of the Trust's assets to themselves (representing their beneficiary interests) and offered again to distribute the Remaindermen their beneficial interests without a release. The Remaindermen's attorney criticized the Trustees for taking their share before the litigation concluded, damages could be determined, and before any attorneys' fees that might be recoverable could be assessed against the trust. His letter reiterated the Remaindermen's position that they were willing to receive their portion so long as receipt did not prejudice this action.

> FN8. Norris P. Wright, letter to David W. Baker (Apr. 17, 1996).

The Trustees argue that these facts show that the Remaindermen had two opportunities to accept a partial disbursement without signing a release on February 5, 1995 and June 24, 1996. Even though the offered disbursements did not require a release, the Remaindermen did not accept. Therefore, the Trustees conclude that this inaction constitutes a failure to mitigate damages. They argue that any award should deduct the amount of the first offer as of the date it was withdrawn, March 1, 1995.

I note that the first offer was made February 5, 1995 and tentatively accepted on February 12. The IRS dispute forced the Trustees to withdraw the offer on March 1, before it could be consummated. The Remaindermen's attorney, Norris P. Wright replied to that offer: "we had considered having our clients take distributions if that could be accomplished without prejudice to the parties' rights." [FN9] My reading of the letter indicates some room for moving forward on disbursement of the Remaindermen's portion of the Trust, but the Remaindermen's position in their brief was that the letter rejects a disbursement to anyone as improper until disposition of this claim. The Trustees agree with that factual interpretation, so I adopt it.

> FN9. *Id.*

*8 The question then is twofold:
*(1) Did the Remaindermen have a duty to mitigate damages in this case by accepting the offer; and*
*(2) if so, did Wright's reply constitute a failure to mitigate?*

The issue of whether a duty exists is a difficult one because the Court is loathe to release a trustee from his or her fiduciary role merely because the beneficiary neglected to accept a tender of funds in the midst of heated litigation. On the other hand, the trust had terminated with William Law's death and an unconditional tender of funds to the Remaindermen would have partially cured the wrong inflicted upon them. The idea that a party must take steps to mitigate a harm is a central principal of our law and under this doctrine, it does not seem, at first blush, unreasonable to deem the offered sum a constructive set off against damages.

Case 1:04-cv-01306-GMS   Document 83-2   Filed 12/29/2005   Page 9 of 9
Not Reported in A.2d
Not Reported in A.2d, 1999 WL 126997 (Del.Ch.)
**(Cite as: 1999 WL 126997 (Del.Ch.))**

Page 8

Under the facts of this case, however, I perceive circumstantial factors that compellingly justify the Remaindermen's position. The Remaindermen were concerned about their right to recover damages and their attorneys' fees against the Trust. They had no statutory accounting by which they could assess the Trust's ability to meet that contingent obligation. Therefore, the Remaindermen wanted the Trust corpus to remain intact until final disposition of their claims. That concern turned out to be material because the Trustees took their share of the Trust corpus without regard for trust liability to the Remaindermen for damages, costs and fees, without filing a statutory accounting, and without petitioning the Court for instructions.

After June 24, 1996, the Trustees had a continuing obligation to manage the Trust with consideration for the interests of all beneficiaries. This is not so light an obligation that it can be dropped at the earliest sign that certain other beneficiaries take issue with the Trustees' actions. The Trustees could have continued to pursue their offer of disbursement with the Remaindermen with appropriate guarantees or petitioned the Court for instructions. After June 24, 1996, they did neither. They elected instead to disburse their share of the corpus without regard to obligations the Trust may have to the Remaindermen. I categorize their actions as inequitable "self-help," excusing the Remaindermen from any obligation to mitigate damages. In order to benefit from equity, one must act equitably. Accordingly, I hold that the Remaindermen's decision to refuse the second offer did not constitute a failure to mitigate damages and could not as a matter of law suspend the Trustees' fiduciary duty to continue to manage the trust. Therefore, the ending day for the purpose of calculating damages for the remaining amount is the date of this judgment.

8. Attorneys' fees

In this action, the Remaindermen have conferred a tangible benefit upon the Trust and its beneficiaries by seeking relief from the Trustees' failure to comply with filing requirements, self-dealing and breaches of fiduciary duty. The Trustees actually exacerbated harm originally caused to the Remaindermen by failing to address their investment interest and demonstrated their faithless management of the assets in their care by distributing their share of the Trust during the course of this litigation. They did so over the Remaindermen's worthy objection that it could undermine the Remaindermen and their attorneys' ability to achieve just compensation in this action. They did so without providing material information ordinarily contained in a statutory accounting and without exercising the prudent action of petitioning the Court for instructions. The Trustees' outrageous conduct imperiled the Remaindermen's right to a recovery and created the real risk that the funds might be commingled in their personal accounts or joint accounts with other persons, dissipated, or subject to judgment elsewhere. Therefore, it is appropriate that the Trustees reimburse the Remaindermen for their attorneys' fees and court costs. Any fair and reasonable overview of the actions of the Trustees over the life of this Trust forces a conclusion that the breaches of fiduciary duty were egregious, tantamount to self-dealing and offensive to the conscience of the Court. Each Trustee shall pay 1/2 of the Remaindermen's fees and costs.

III. CONCLUSION

*9 The Trustees shall compensate the Remaindermen for the loss caused by the Trustees' willful breach of fiduciary duty. The sum shall be calculated under the assumptions of the Snyder 50/50 equity to debt scenario with a starting date of August 31, 1983 and ending the day this Opinion issues with one modification. The parties shall deduct an 80 basis point annual fee equally from equity income and principal for each year (prorating as necessary). Subject to review of an affidavit from Plaintiffs' counsel, the Trustees shall pay the Remaindermen's attorneys' fees and costs in their entirety. Plaintiffs' counsel shall submit a form of order consistent with this Opinion.

IT IS SO ORDERED.

Not Reported in A.2d, 1999 WL 126997 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.