# EXHIBIT 1

Baystate
Medical Center
Children's
Hospital
*A Member of Baystate Health Systems*

Springfield, Massachusetts 01199

**Pediatric Critical Care**
(413) 794-4441
Fax: (413) 794-3623

Stephen Lieberman, M.D.
Chief

Christine McKiernan, M.D.
Associate Director

Francis Duda, M.D.

September 21, 2005

Robert Hunn, Esq.
Kolsby, Gordon, Robin, Shore & Bezar
One Liberty Place, 22nd Floor
1650 Market Street
Philadelphia, PA  19103

Re:  Catherine Laag v. A.I. duPont Hospital for Children

Dear Mr. Hunn:

I am in receipt of the report of Bradley P. Fuhrman, M.D. and the deposition of Dr. Stephen Cook, M.D.

Having reviewed Dr. Fuhrman's report, my opinion remains unchanged.  Dr. Furman states that the decision to extubate was within the standard of care and further states that Catherine Laag met Dr. Cullen's criteria for extubation.  I do not agree that Dr. Cullen's criteria for extubation are part of the standard of care.  This rings of circular logic.  He states that Dr. Cullen met the standard of care but then bases the standard of care on Dr. Cullen's chosen course of care.

Dr. Fuhrman states that in Catherine's case, the swelling in her airway was "severe."  There is no documentation in the chart that Catherine had severe swelling.  Rather, the fellow, Dr. Boyd, noted that she was able to visualize the cords.  The number of intubation attempts made (at least four) makes it reasonable to conclude that during the code, no one felt that there was so much swelling that attempting intubation was waste of time.

Dr. Boyd's progress note times the first intubation attempt at 11:45 a.m.  She notes that they were unable to increase oxygen saturation despite bag-valve mask ventilation.  By 12:04 p.m., Catherine's pulse ox was 15.  Dr. Stephen Cook testified that he was in the room less than five minutes before he successfully intubated Catherine and his intubation is timed at 12:24 p.m.  If swelling was as "severe" as suggested by Dr. Fuhrman, then DuPont physicians wasted precious time with multiple intubation attempts instead of immediately attempting surgical intervention.

Re:  Catherine Laag v. A.I. duPont Hospital for Children

A nurse's note timed at 12:05 p.m. notes that Catherine was in full arrest with oxygen saturation levels below 40%.  The code sheet records pulse oximetry readings from 0 to 65 between 12:05 and 12:18 p.m.  During this long period of time, Catherine's brain was deprived of sufficient oxygen causing anoxic encephalopathy.

I disagree with Dr. Fuhrman's comment that had the extubation been postponed, the same sequence of events would have occurred at a later time.  Healthy or healthier lungs can counter balance for swelling within the airway.  Had Catherine been extubated when she was healthier, there is no reason to believe that she would have suffered anoxic encephalopathy.

Dr. Fuhrman states that the airway swelling was not foreseeable.  I do not see this matter as a question of whether Dr. Cullen could have known in advance that there would definitely be airway swelling.  Rather, it is generally known that children with Down syndrome have smaller airways which can make intubation difficult.  In extubating Catherine when she was not ready, Dr. Cullen should have recognized that if reintubation was difficult, she was at a higher risk for inadequate oxygenation.  Dr. Cullen was taking an unreasonable risk in exposing Catherine Laag to dangerous respiratory complications which her body could not compensate for.  There was no emergent need to extubate Catherine on the morning of September 9, 2003 and the risk of harm to Catherine significantly outweighed any benefit.

In the deposition of Cheryl Martinenza, it is indicated that Dr. Cullen made a last minute decision to extubate to Bi-PAP despite her concerns regarding the significance of Catherine's secretions.  By his own conduct, Dr. Cullen did recognize that extubating Catherine would expose her to a heightened and unacceptable risk and therefore made a decision to place her immediately on Bi-PAP.  This was ill conceived thinking on his part as Bi-PAP is not a substitute for mechanical ventilation.  His hasty decision was in breach of the standard of care and led to the catastrophic result that occurred.

Sincerely,

Stephen Lieberman, M.D.

# EXHIBIT 2

# COLUMBIA UNIVERSITY
## COLLEGE OF PHYSICIANS & SURGEONS

### DEPARTMENT OF PEDIATRICS

October 4, 2005

Robert N. Hunn
Kolsby, Gordon, Robin, Shore, and Bezar
One Liberty Place
1650 Market Street, 2nd Floor
Philadelphia, PA 19103

**Re: Catherine Lagg, a minor, vs. A.I. DuPont Hospital for Children and others**

Dr. Mr. Hunn

I am a physician specializing in the subspecialty of Pediatric Critical Care Medicine, licensed to practice in the State of New York. I am certified in both Pediatrics and Pediatric Critical Care Medicine by the American Board of Pediatrics and have practiced for 13 years in my subspecialty. I am an Assistant Professor of Clinical Pediatrics at Columbia University, College of Physicians and Surgeons and the Director of the Pediatric Critical Care Medicine Fellowship, a highly-competitive training program in the subspecialty. Previous to my tenure at Columbia, I held an academic faculty position at Yale University, School of Medicine. I have numerous medical publications and have been invited to speak on various topics in the field.

This letter concerns my findings in the above named case. My review of material includes: the office records of Catherine Laag's pediatricians from 1993 to 2003; the hospital records of the same patient for the period of 8/27/03 to 9/13/03, with specific review of the physicians' notes, nursing notes and bedside documentation sheets, the respiratory therapy notes, and the resuscitation event sheet; the depositions of Cheryl Martinenza, RN and Edward Cullen, D.O.; and the letter of Bradley Fuhrman, MD.

Catherine Laag was, at the time of her admission to A.I. DuPont Hospital, a 10 year old girl with Down Syndrome. Per her pediatricians' notes, she was a highly functioning child and was in general good health with only occasional childhood upper respiratory illness. She contracted pneumonia and was admitted to DuPont Hospital on August 27, 2003. Catherine was initially treated with antibiotics and

supplemental oxygen; however, her condition worsened. She was tried on Bilevel Positive Airway Pressure (BiPAP) support, a non-invasive mode of respiratory support, which she did not tolerate. She was intubated and placed on a conventional mechanical ventilator (CMV). Her condition rapidly deteriorated and she required ventilation with the High Frequency Oscillator (HFOV) to maintain adequate oxygenation of her blood and tissues. For several days, it was also necessary to administer Catherine a neuromuscular blocking agent to "paralyze" her muscles to allow for optimal support on the HFOV and to minimize her tissue demands for oxygen. She had a prolonged course of ventilation with gradual improvement so that it was possible to return Catherine to CMV 2 ½ days before she was extubated, *i.e.* before her endotracheal tube was removed. On September 9, 2003, Catherine was removed from ventilatory support and extubated. She suffered a cardiorespiratory arrest after this procedure. She required full CPR efforts and advanced life support measures, with chest compressions for greater than 20 minutes, before her circulation was restored. As a result of this arrest, she suffered severe, global, hypoxic-ischemic brain injury and is left with extremely poor neurologic functioning.

The cause of Catherine's arrest was a combination of glottic (structures of the vocal cords and adjacent tissue) and tracheal airway obstruction and continued hypoxemic respiratory failure.

I will treat these two issues, and the management of them, in separate discussions. Catherine had two risk factors for her airway obstruction, namely prolonged endotracheal intubation and excessive physical movement. The tracheal wall may become damaged with prolonged intubation by approximation of the semi-rigid endotracheal tube with the tracheal wall. There is repeated trauma to the tracheal wall, which reacts with inflammation and swelling. There was likely additional swelling caused by Catherine's excessive movements. The medical record makes note of Catherine's agitation and increased movement before extubation. Children of her age, and especially children with mental retardation, may thrash around, whipping their head from side-to-side in agitation a general response to the presence of the endotracheal tube, other invasive lines and devices, and relative immobility. Excessive movement of the head can cause the endotracheal tube to rub against the tracheal wall causing swelling and narrowing of the airway.

It may be difficult to determine in advance of extubation the extent to which prolonged intubation and movement-induced tracheal trauma has caused airway swelling; prudent practice dictates that an effort at such determination be made. A "leak test" of the airway can be of assistance in this determination. A leak test is performed by insufflating the airway and lungs with air at relatively high pressures and listening over the glottic airway for escape of air around the outside of the tube, suggesting open space between the wall of the trachea and the outer wall of

the endotracheal tube. Review of the respiratory therapy records reveals that the cuff on Catherine's endotracheal tube was in a deflated state before her extubation. Deflation of the tube cuff is the first step performed in the leak test when using the type of tube that Catherine had. However, there is no documentation that a leak test was performed nor is there any evidence that there was a leak around the patient's endotracheal tube with insufflation of the airway and lungs with the usual breaths delivered by the ventilator.

While the leak test is by no means "fool proof" in its determination of airway patency, the presence of a leak generally suggests lesser likelihood of airway obstruction, especially lesser likelihood of obstruction sufficient to cause respiratory arrest in the immediate post-extubation period. Treatment for suspected airway obstruction is usually to resedate the patient and wait until the situation is improved; minimization of head movements; and removal of excess body fluids if present and if thought to be contributing to the airway issue. Additionally, many practitioners administer steroids before extubation to reduce swelling. As Catherine had two risk factors for airway swelling, it is a breech of prudent practice to not at least attempt to determine if the airway is likely to be patent and to consider aborting the extubation attempt if significant airway narrowing is suspected.

The second condition that predisposed Catherine to cardiorespiratory arrest was her hypoxemic respiratory failure. The term refers to a diminished ability of the lung tissue to deliver oxygen to and remove carbon dioxide from the blood stream and the need for respiratory assistance. In Catherine's case, her hypoxemic respiratory failure had been severe and was the result of her pneumonia, but was improving at the time of her extubation. On the day of Catherine's extubation she required 50 to 60% oxygen while being supported on the ventilator. Her blood was mildly to moderately desaturated with, according to the medical record, saturations of the low to mid 90s, demonstrating that she absolutely required a moderately high level of oxygen support.

The practice ordinarily employed in the field of critical care for determining if a patient is ready for extubation, is to consider performing the procedure when they require 40% or less of oxygen. This standard is used for patients in whom the hypoxemia is the result of respiratory disease, as was the case with Catherine. Clinical practice has evolved to accept this cutoff of 40% as this amount of oxygen that can be reliably administered using usual devices, whereas greater concentrations cannot. Accordingly, patients, especially patients with severe respiratory failure, are weaned until they no longer require greater than 40% oxygen and then are extubated. Concentrations of oxygen greater than 40% can be delivered by CPAP or BiPAP, although it is frequently difficult to sustain an oxygen delivery of 60%, or even 50%.

To be assured that Catherine would receive a higher level of oxygen, she would have had to remain with virtually uninterrupted BiPAP. Tolerance of BiPAP can be difficult for a child as the BiPAP mask presses on the face. Such tolerance can be more difficult in a 10 year child with Down Syndrome as she may not understand the need for the device as readily as a child without this condition. In fact, a trial of BiPAP had been performed earlier in her hospitalization and she had become very agitated with the device. Her cooperation with the procedure could be by no means assured and without the device insufficient oxygen would have been delivered. Additionally on the morning of her extubation, Catherine had copious tracheal secretions requiring frequent suctioning of her airway. After extubation, she would have been required to cough such secretions out. Removal of her BiPAP device and interruption of her oxygen supply would have been required to clear secretions from her face or mouth. As her cooperation with BiPAP could not be assured and as interruption of BiPAP support should have been anticipated, extubation of Catherine while still requiring greater than 40% oxygen was a breech of good medical practice and constitutes negligence.

In the end, Catherine's cardiorespiratory arrest was the combination of a narrowed airway and continued need for moderate oxygen support. Her degree of airway narrowing would have required reintubation, but had she had less lung disease and less of an oxygen requirement, the maneuvers used before her extubation (hand ventilation with 100% oxygen) would have resulted in better delivery of oxygen to her bloodstream and tissues. It is likely that she could have sustained a longer period of time with the airway obstruction without cardiac arrest.

These events are regrettable, as is Catherine's outcome. Unfortunately, the results stem from a breech in care.

Sincerely,

Katherine Biagas, M.D.
Director, Pediatric Critical Care Medicine Fellowship
Assistant Professor of Clinical Pediatrics
Columbia University, College of Physicians and Surgeons
New York Presbyterian Hospital

# EXHIBIT 3

Michael P. Kelly

Managing Partner
mkelly@mccarter.com

McCarter & English, LLP
Suite 1800
919 N. Market Street
P.O. Box 111
Wilmington, DE 19899
tel 302.984.6300
fax 302.984.6399
www.mccarter.com

November 16, 2005

**VIA FACSIMILE: 215-851-9701**

## McCARTER ENGLISH
ATTORNEYS AT LAW

Mr. Robert Hunn
Law Offices of Kolsby, Gordon, Robin, Shore
& Bezar
1 Liberty Place, 22nd Floor
1650 Market Street
Philadelphia, PA 19103

Re:  Lagg v. Cullen et al. : Expert Report of Dr. Venkataraman

Dear Mr. Hunn:

Enclosed please find the expert report and *curriculum vitae* of Dr. Shekhar Venkatamaran, which the defendants received today.  Dr. Venkatamaran will testify as a standard of care expert in this case.  I have also sent this information electronically in the form of a PDF.  Please contact me if there are any questions.

Very truly yours,

Michael P. Kelly

Encls.    C.V. and Expert Report of Shekhar
          Venkatamaran, M.D.

cc:    Tracy Coleman (w/encl.)
       Phyllis Rosenbaum (w/encl.)

ME1\5342821.1

**Pediatric Critical Care Medicine**

3705 Fifth Avenue
Pittsburgh, PA 15213-2583

Ph: (412) 692-5164
Fx: (412) 692-6076

# Children's
Hospital of Pittsburgh

Ann E. Thompson, MD
Director

Rajesh Aneja, MD
Hülya Bayir, MD
Joseph Carcillo, MD
Constantinos Chrysostomou, MD
Robert Clark, MD
Kathryn Felmet, MD
Melinda Fiedor, MD
Ericka Fink, MD
Patrick Kochanek, MD
Yi-Chen Lai, MD
Ricardo Munoz, MD
Richard Orr, MD
Shekhar Venkataraman, MD
R. Scott Watson, MD, MPH

RECEIVED

NOV 16 2005

McCARTER & ENGLISH
WILMINGTON, DE

November 12, 2005

Paul A. Bradley
McCarter & English, LLP
919 N. Market Street
Wilmington, Delaware 19899

RE: Catherine Laag, a minor vs A.I. DuPont Hospital for Children and others

Dear Mr. Bradley

     I am Pediatric Critical Care Specialist who is currently licensed to practice in the State of Pennsylvania. I am Board-Certified in both Pediatrics and the subspecialty of Pediatric Critical Care by the American Board of Pediatrics. I have been an Attending Physician in Pediatric Critical Care in the Pediatric Intensive Care Unit at Children since 1987. I am an Associate Professor in the Department of Critical Care at the University of Pittsburgh School of Medicine. I am also the Medical Director of Respiratory Care Services at the Children's Hospital of Pittsburgh. I have numerous publications and have been invited to speak on various topics both here in the USA and abroad.

     This letter outlines my findings in the above named case. The documents I have reviewed in preparing my report are as follows:

- Chest X-ray reports of 8/28, 8/29, 8/30, 9/2-9/10/2003
- Respiratory therapy flow sheets from 8/27/2003 to 9/10/2003 including blood gases
- Resuscitation flow sheet
- Critical Care Progress Notes from 8/28/2003 to 9/11/2003
- Nurses Notes from 9/7/2003 to 9/10/2003
- Defendant's Expert Report of Bradley P. Fuhrman M.D.
- Defendant's Expert Deposition of Bradley P. Fuhrman M.D.
- Plaintiff's Expert report of Katherine Biagas M.D.

- Plaintiff's Expert report of Stephen Lieberman M.D.
- Plaintiff's Expert deposition of Stephen Lieberman M.D.
- Deposition of Edward J. Cullen, Jr. D.O
- Deposition of Caroline Boyd M.D.
- Deposition of Cheryl Martinenza R.N.

Case summary from admission to 9/9/2003

Catherine Laag was a 10 yr old female with Trisomy 21 who was to admitted on the 27th of August, 2003 to A.I. Dupont Hospital with mycoplasma pneumonia. She was initially treated with supplemental oxygen by facemask. But, her respiratory status worsened and she was tried on noninvasive mechanical ventilation with nasal BiPAP (Bi-Level Positive Airway Pressure) starting around 0015 hrs on 8/28/2003. From the records, it appears that she tolerated the BiPAP on the morning of 8/28/2003. As the day progressed, her respiratory status worsened and did not improve despite an increase in BiPAP settings nor switching to facemask BiPAP. Therefore, Dr. Cullen intubated her on 8/29/2003 with a 6.0 cuffed endotracheal tube. She was initially placed on conventional mechanical ventilation. Due to worsening oxygenation failure, she was switched to high frequency ventilation on 9/1/2003. Until she was switched to high frequency ventilation, it appears that she was only sedated. Once she was on high frequency ventilation, she was sedated and additionally paralyzed with neuromuscular blocking agents. She was switched back to a conventional ventilator on 9/5/2003 and was placed on Pressure-Regulated Volume Control mode of ventilation. On 9/7/2003, she was changed to Synchronized Intermittent Mandatory Ventilation (Volume-regulated) with pressure-support. Her neuromuscular blockade was also discontinued on 9/7/2003. She was weaned on SIMV+PS down to a rate of 10/min, PEEP of 6, FiO2 0.5, and a Pressure-support level of 10 cms of water by the morning of 9/9/2003.

It is my opinion that Catherine Laag received aggressive and appropriate critical care from the time of admission to the morning of 9/9/2003. In this case, it is the care that she received on 9/9/2003 that is in question. My opinions about both the care that Ms. Laag received on 9/9/2003 and the issues raised by Drs. Biagas and Lieberman are discussed below.

Events of 9/9/2003

On 9/9/2003, she was extubated after a trial of CPAP and was immediately placed on Bi-PAP. She developed respiratory distress that did not improve despite oropharyngeal suctioning, sedation, and increasing the Bi-PAP support. A decision was made to emergently reintubate her. She required multiple attempts to intubate – the first attempt by Dr. Boyd, then by Dr. Cullen, then by 2 anesthesiologists and then by 2 ENT surgeons. She was successfully intubated using a 4.5 uncuffed endotracheal tube by the second ENT surgeon, Dr. Cook. During the attempts at intubation, she became hypoxemic and then sustained a cardiac arrest and required cardiopulmonary resuscitation. She was successfully resuscitated but unfortunately, is reported to have sustained significant brain damage.

The cause of her respiratory difficulty and the need for emergent reintubation was severe upper airway swelling. The proximate cause of her significant brain injury was the lack of

sufficient amounts of oxygen and blood flow to the brain that occurred during this unfortunate event.

In deciding to extubate a patient such as Ms. Laag, the first determination that must be made is that the patient's lung disease is improving and is expected to improve further with time. Ms. Laag's lung disease had improved such that on the morning of 9/9/2003, she was requiring about 50% inspired oxygen, on a rate of 10/min, a pressure-support level of 10, and a PEEP of 6. Over the preceding 48 hours, she had been weaned from a PEEP of 10 to 6, a rate of 20/min to 10/min, from a mean airway pressure of 16 cms to 10 cms, and from an FiO2 of 0.6 to 0.5. The PEEP had been reduced to 6 cms for at least 24 hours. The chest x-rays, despite showing significant improvement, still showed some residual lung disease. The data from the chart indicates that there was neither a substantial increase in the endtidal carbon dioxide or work of breathing nor a reduction in the oxygen saturation following that level of weaning. In fact, the data indicates that she was able to maintain her oxygenation and ventilation while she was being weaned. This would suggest that despite the appearance of the chest x-rays, the patient was able to tolerate the weaning performed over the previous 2 days.

When it has been determined that the patient's lung disease has progressed enough, certain other factors need to be considered before extubation. The first of these factors is that the patient is sufficiently awake. On 9/9/2003, a decision was made to discontinue propofol in anticipation for potential extubation. Propofol is a sedative that was started on 9/8/2003 as a continuous infusion as part of her sedation regimen. As per the nurses notes, propofol was discontinued at 1050 hrs and the patient was noted to be "arousing nicely" and later noted to be "responding to simple questions appropriately with head shakes". This indicates that she was sufficiently awake. The second factor is that the patient should have a reasonably good cough to bring up secretions that may collect in the tracheobronchial tree. The Respiratory Therapist's note from 9/9/2003 indicates that, prior to extubation she had a moderately strong cough.

The third factor is the issue of secretions and the need for suctioning. On 9/7/2003, while this child was still sedated and paralyzed, her frequency of suctioning was every 4 hours and the quality of the secretions were recorded as thin and white. Once her neuromuscular blocker Rocuronium, was stopped, she is reported to have become agitated. With that the quality of the secretions changed and became moderately thick. She was suctioned every 3 hours through the night of 9/7/2003 and during the day on 9/8/2003 with no change in her oxygen saturation or need for increased oxygen. During this time, it was noted that she was difficult to sedate and needed a dose of pentobarbitol to control her sedation. Due to the difficulty in maintaining her sedation, she was started on propofol which was successful in sedating her. In fact, her records indicate that she was deeply sedated with the dose of propofol that was prescribed for her. As soon as her sedation became more controlled, the quality of her secretions became small and white again. On the morning of 9/9/2003, when she became less sedated the quality of her secretions again changed to large and thick. She was suctioned 3 times after midnight before extubation. The last suctioning was a planned suctioning as indicated in the nurses notes. The fact that the quality of her secretions changed with the level of her sedation leads me to conclude that a major contributor for her secretions was the presence of the endotracheal tube irritating her airway. In my opinion, the frequency of suctioning noted in the records cannot be characterized as frequent enough to hold off extubation.

Other factors that need to be considered before extubation relate to the patient's ability to sustain spontaneous breathing and the level of support required to sustain the spontaneous effort once the patient is extubated. In September 2003, the practice in children included both extubation from a low level of ventilator support and after a trial of complete spontaneous breathing. At that time, there were 3 clinically accepted methods of assessing a patient's ability to sustain spontaneous breathing - a CPAP trial, a trial with minimal pressure support with low levels of PEEP, and a T-piece trial. In a CPAP trial, there is a constant level of airway pressure, usually 5 cms or lower applied to the airway. This can be accomplished either through the ventilator, through a special CPAP device, or using a Mapleson bag. Minimal pressure support with PEEP trial uses a low level of Pressure Support (between 5 and 8 cms) with a low level of PEEP (5 cms or lower). In a T-piece trial, sufficient flow of oxygen is provided without any positive airway pressure through the endotracheal tube. Generally, these trials can last anywhere from 30 minutes to 2 hours. During these trials, an assessment is made regarding the effort of breathing, the ability to maintain both oxygenation and ventilation, and any change in vital signs related to the test. If a patient can maintain adequate oxygenation and ventilation without excessive effort and with minimal changes in vital signs, then the patient is deemed to have passed the test. Passing this test implies that the patient can sustain spontaneous breathing after extubation. Despite passing the test for complete spontaneous breathing, some children do require reintubation. On the other hand, if the lung function is marginal or poor, then the patient would not be able to tolerate and pass this test. Intolerance of the trial of complete spontaneous breathing would be reflected by an increase in endtidal carbon dioxide level, work of breathing, respiratory rate and often associated with a fall in oxygen saturations. In September 2003, a CPAP trial would be an acceptable test to evaluate the patient's ability to breathe spontaneously. According to Dr. Cullen's note dated 9/9/2003 and the depositions of both Dr. Cullen and Dr. Boyd, Ms. Laag was subjected to a CPAP trial. Such a trial would be an appropriate standard of care prior to extubation considering the level of support that she was receiving on the morning of 9/9/2003. The exact duration of the CPAP trial is not clear from the records. Dr. Cullen's note on 9/9/2003 (timed 1410 hrs) reports that the patient had pulse oximeter saturations of greater than 93% on 50% oxygen with end-tidal carbon dioxide levels of 45-50 on CPAP of 5. The patient's arterial catheter had been discontinued the day before extubation. The records show that there was a good correlation between the arterial carbon dioxide and the endtidal carbon dioxide. So, the endtidal carbon dioxide level would be a reasonably good reflection of her arterial carbon dioxide. An endtidal carbon dioxide of 45-50 with pulse oximeter readings of greater that 93% on 5 cms of CPAP provides at least some indication that the patient was able to breathe effectively. It appears from both Dr. Boyd's and Dr. Cullen's depositions that the patient tolerated the CPAP trial. In addition, as per the Ms. Martinenza's deposition, it appears that they tried to optimize conditions for extubation by suctioning the endotracheal tube, administering albuterol and then hyperventilating and hyperoxygenating the patient just before extubation - all these would also be appropriate actions before extubation.

A child who is difficult to sedate poses a special problem. If they are under-sedated, they will thrash around and that increases the chance that they will have significant airway trauma. Oversedation will definitely prolong their duration of mechanical ventilation and increase the chance of infection, airway trauma, and drug-dependence. In these patients, the usual approach of slowly decreasing the sedation to allow more gradual spontaneous breathing has a high chance

of failure. Often, in such cases, patients may need to extubated as soon as they are awake enough to sustain spontaneous breathing. The trial of CPAP, in my opinion, demonstrates an attempt by Dr. Cullen to evaluate her ability to breathe spontaneously if she were extubated. The risk of reintubation has to weighed against the risk of heavy sedation, prolongation of mechanical ventilation, increased chances for airway injury and the increased chance for infection with the presence of the endotracheal tube. It appears that Dr. Cullen was faced with such a dilemma. Under these circumstances, well-qualified Pediatric Intensive Care Physicians can differ in their approach.

Most commonly, patients are extubated and placed on supplemental oxygen without any positive pressure assistance. In some instances, it may be appropriate to extubate a patient to some level of noninvasive positive pressure support in addition to supplemental oxygen. Both approaches are acceptable standards of care. Based on the level of support she was receiving at the time of extubation, it is my opinion, that this child would have needed some level of positive pressure support with supplemental oxygen after extubation. She would have, most likely, not tolerated extubation to just supplemental oxygen without some form of positive airway pressure support. Despite his evaluation that she tolerated the CPAP trial, Dr. Cullen made the decision to place this patient on Bi-PAP immediately after extubation. This indicates that Dr. Cullen seemed to have recognized that Ms. Laag could not be extubated without needing some level of positive pressure support. On 9/9/2003, just prior to extubation, the nurse's notes indicate that the caretakers were "awaiting resp (I assume this means Respiratory Therapist) to set-up BiPAP and give additional albuterol to be followed by good sx (I assume it means suctioning) before we extubate". The nurses notes indicate that the patient was extubated around 1135 hrs and immediately placed on Bi-PAP by facemask and a good seal was obtained with the facemask.

Soon after extubation, she developed respiratory distress that did not improve despite sedation and an increase in Bi-PAP support. Preparations seem to have been made immediately for an emergent reintubation. Dr. Boyd attempted intubating this patient first. Dr. Boyd states in her deposition that she noted redness and swelling and was unable to pass a 6.0 ETT through the vocal cords. Dr. Cullen took over and soon after called for help both to get the difficult airway cart and to call Anesthesiology and ENT. In my opinion, that was the perfectly appropriate action to take when one recognizes that this is going to be a difficult intubation. While it is clear that Dr. Cullen performed a direct laryngoscopy to intubate the patient, it is unclear whether he himself made any attempts at intubation per se. There is no doubt that this patient had severe airway swelling that made it difficult for even well-qualified physicians to reintubate her. It took several attempts by two Attending Anesthesiologists and ENT surgeons before she was successfully intubated. The fact that she was finally intubated with a 4.5 mm uncuffed tube also supports the diagnosis of severe airway swelling. It is known that airway mucosa can swell after extubation. The degree to which the airway can swell is variable between patients and cannot be predicted prior to extubation. The level of severe airway swelling that occurred in this patient after extubation is extremely rare and cannot be predicted.

Some Issues raised by both Dr. Biagas and Dr. Lieberman

Both Drs. Biagas and Lieberman have raised the issue of a leak test. The leak test roughly correlates with the amount of space around the ETT. It is important to distinguish

between 2 types of endotracheal tube leaks. One is very obvious and easily heard at the bedside without using a stethoscope by even an inexperienced observer. The other is not so obvious and requires auscultation over the laryngeal area to appreciate a leak around the endotracheal tube. The reliability of a leak test has been tested only with uncuffed endotracheal tubes in children. Studies on the reliability of the leak test with uncuffed endotracheal tubes have yielded conflicting results with some reporting good reliability and others showing poor reliability. Moreover, a leak test yields completely different results depending on the position of the head and neck, the level of sedation and neuromuscular blockade, and the position of the endotracheal tube. There is also considerable variation between experienced observers in assessing leak pressures. It is also important to note that in all the studies that have examined the reliability of the leak test, all the patients have been extubated irrespective of the level of leak. The reliability of the leak test has not been tested sufficiently with cuffed endotracheal tubes in children. In this case, the cuff of the endotracheal tube was deflated for at least 24 hours before extubation. A leak test cannot measure the degree of swelling that may develop once the endotracheal tube is removed from the trachea. It is currently not a standard practice to administer corticosteroids to all patients prior to extubation. Studies on the prophylactic use of corticosteroids prior to extubation have yielded conflicting results. So, in my opinion, not administering corticosteroids in this patient prior to extubation would not be considered a breach of care.

The radiology reports and Dr. Lieberman have referred to chest x-rays showing "hypoventilation". The term hypoventilation refers to a condition where the patient is taking ineffective breaths such that the carbon dioxide levels increase in the blood. Therefore, the term "hypoventilating or hypoventilation" cannot be used to describe the findings on a chest x-ray. The chest xray only offers a rough picture of the level of lung expansion. Lung volume appearance on chest x-rays are not reliable indicators of the actual lung volume. The level of lung expansion seen on a chest x-ray can vary depending on whether the chest x-ray was taken during inspiration or expiration. Chest x-rays takne during expiration will always tend to have less lung expansion than those done during expiration.

Dr. Lieberman has also opined that "If swelling was as severe as asuggested by Dr. Fuhrman, then DuPont physicians wasted precious time with multiple intubation attempts instead of immediately attempting surgical intervention". Dr. Lieberman seems to be questioning both the diagnosis of severe airway swelling and the approach DuPont physicians took even if the diagnosis of severe airway swelling was true. There is no doubt in my mind that she had severe swelling as explained earlier. As to the second point, Pediatric Intensive Care Physicians do not have the training and expertise to perform a tracheostomy. To expect a Pediatric Intensive Care Physician to perform a surgical procedure to secure an artificial airway is asking them to perform way beyond their expertise. Neither am I aware that Pediatric Anesthesiologists have such training and expertise. Emergency tracheostomy for children in a tertiary care hospital is usually performed by either a Pediatric Surgeon or an ENT surgeon. Two ENT surgeons responded quickly to this crisis and chose to attempt intubation and the second surgeon was successful in placing a tube far smaller than the original endotracheal tube that was placed in this child. Not being able to perform a tracheostomy by a Pediatric Intensive Care Physician does not constitute a breach of care.

In summary, it is my opinion, based on the information provided to me, that Catherine

Laag received a level of care that was well within the standard of care expected in a Pediatric Intensive Care Unit. It is unfortunate and regrettable that Catherine Laag has suffered significant brain injury.

Sincerely

Shekhar T. Venkataraman M.D.
Associate Professor, Departments of Critical Care Medicine and Pediatrics
University of Pittsburgh School of Medicine
Pediatric Intensivist, Children's Hospital of Pittsburgh
Medical Director, Respiratory Care Services, Children's Hospital of Pittsburgh
3705 Fifth Avenue, Room # 6831
Pittsburgh, PA 15213
Tel: 412-692-5164
e-mail: venkataramanst@ccm.upmc.edu

# EXHIBIT 4

-----Original Message-----
**From:** Robert Hunn [mailto:rhunn@kolsbygordon.com]
**Sent:** Monday, November 07, 2005 2:38 PM
**To:** Bradley, Paul
**Subject:** Re: Laag

If you're planning to have Dr. Cullen testify on the standard of care (defend his care) then perhaps we need to talk. Right now, you have two liability witnesses (Cullen and Fuhrman) and we have two liability witnesses (Leiberman and Biagas). If you add another liability witness then we do not have the fair balance that presently exists.
Let me know what you are going to do.
Thanks
Bob


Robert N. Hunn, Esquire
Kolsby Gordon Robin Shore & Bezar
22nd Floor
One Liberty Place
Philadelphia, PA 19103
(215) 851-9700

----- Original Message -----
**From:** Bradley, Paul
**To:** Robert Hunn
**Sent:** Monday, November 07, 2005 10:59 AM
**Subject:** RE: Laag

Hi. I have consulted with an additional witness to review the Dr. Biagis report along with other materials. I will produce a report as soon as possible if I intend to use the witness.


This email message from the law firm of McCarter & English, LLP is for the sole use of the intended recipient(s)and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email(or helpdesk@mccarter.com) and destroy all copies of the original message.

11/7/2005

# EXHIBIT 5

# Kolsby|Gordon

Kolsby • Gordon • Robin • Shore • Bezar
TRIAL ATTORNEYS

One Liberty Place ◆
1650 Market Street, 22nd Floor Philadelphia, PA 19103

T: 215.851.9700     F: 215.851.9701     800.709.3193
info@kolsbygordon.com  www.kolsbygordon.com

Robert N. Hunn
rhunn@kolsbygordon.com

December 13, 2005

**VIA FACSIMILE AND
FIRST CLASS MAIL**
Michael P. Kelly, Esquire
McCarter & English
919 N. Market Street
Suite 1800
P.O. Box 111
Wilmington, DE  19899

RE:     **Laag vs. DuPont, et al.**

Dear Mr. Kelly:

Plaintiff has decided not to call Dr. Katherine Biagas as a witness at trial.  We are therefore canceling her deposition scheduled for Wednesday, December 14, 2005.

Very truly yours,

Robert N. Hunn

RNH/jmm